A

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREW BARTON, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| VS. | : | NO. 302CV1210(PCD) |
| | : | |
| CITY OF BRISTOL; AND IN THEIR INDIVIDUAL | : | |
| AND OFFICIAL CAPACITIES, RICHARD MULLANEY | : | |
| POLICE SERGEANT; BRIAN SUCHINSKI, POLICE | : | |
| DETECTIVE; AFSCME LOCAL 3754; AND IN HIS | : | |
| INDIVIDUAL AND OFFICIAL CAPACITY MELVIN | : | |
| DEKOW, UNION PRESIDENT | : | |
| Defendants | : | JULY 29, 2003 |

## AFFIDAVIT

I, Richard Mullaney, being duly sworn, hereby depose and say:

1.      I am over the age of eighteen and understand the obligation of an oath.

2.      I am a defendant in the above-entitled action and, as such, I have knowledge of the facts surrounding the underlying claim.

3.      In 1974, I became employed full-time as a Patrol Officer with the Bristol Police Department.

4.      In 1988, I was promoted to the rank of Patrol Sergeant in the Bristol Police Department, and in 1997, I was promoted to the rank of Detective Sergeant.

5.      As a Detective Sergeant, I supervised detectives in the Criminal Investigations

KERNAN & HENRY, LLP   ATTORNEYS AT LAW
P. O. BOX 2156   •   WATERBURY, CONNECTICUT 06722   •   (203) 756-8961   •   JURIS NO. 30960   •   FAX (203) 754-2353

Division until 1999.

6.      In 1999, I was transferred to the Narcotics Enforcement Team where I was responsible for supervising detectives including the plaintiff, Andrew Barton.

7.      On August 31, 1999, a joint narcotics investigation was conducted by the Bristol and West Hartford Police Departments.

8.      The investigation concerned a suspicious package which had been reported to the West Hartford Police Department by Airborne Express and was later determined to contain large amounts of marijuana.

9.      The package had a delivery address of Meineke Muffler, 114 Farmington Avenue in Bristol.

10.     Detectives from the Bristol and West Hartford Police Departments collaborated in a joint investigation in which a controlled delivery of the package was attempted.

11.     The package was delivered by a West Hartford detective disguised as an Airborne Express delivery person and was received by a Meineke Muffler employee later identified as Rivera.

12.     Rivera indicated to the detectives conducting the investigation that he had received the package for an acquaintance named "Eddie" in exchange for payment of $1,000.  Rivera then paged "Eddie" for the purpose of notifying him of the arrival of the package.

13.    "Eddie" failed to respond to Rivera's pages, and after about an hour, it became apparent that "Eddie" was not going to show up.

14.    At that time, I decided to end the investigation and to place Rivera under arrest. There was sufficient probable cause to arrest Rivera at the scene.

15.    Just prior to placing Rivera under arrest, I was in the bay/garage area of the business and was standing with West Hartford Detective Sergeant Carl Rosenweig and Detective Bill Kinahan.  Also standing nearby were Bristol Detective Brian Suchinski and two Meineke employees.

16.    At that time, Detective Chris Lennon approached me and stated that he wished to obtain a warrant for Rivera's arrest instead of arresting him at the scene.

17.    I began to discuss this topic with Detective Lennon when Detective Andrew Barton approached, interrupted our discussion and declared his intention to arrest the suspect with a warrant rather than at the scene.

18.    I told Detective Barton that the suspect would be arrested at the scene, and Detective Barton walked away.

19.    A short time later, Detective Barton approached me again concerning the use of an arrest warrant.

20.    I told Detective Barton that I had decided to arrest Rivera at the scene, however,

Barton continued to vigorously dispute my decision, at times raising his voice, in full view of the West Hartford Detectives and the Meineke employees.

21.     I finally put an end to the dispute by firmly telling Detective Barton that the suspect would be arrested at the scene and that the decision was final and was not open to debate.

22.     On September 1, 1999, I made a verbal report of the Meineke Muffler incident to Detective Lieutenant Thomas Killiany who requested a written report for his review.  I submitted a written report of the incident to Lieutenant Killiany on September 3, 1999.

23.     After reviewing my report, Lieutenant Killiany, Captain Donald Kalwat and Police Chief John DiVenere recommended that I issue a written reprimand to Detective Barton for violations of two sections of the Bristol Police Department Code of Conduct, Section 1.00 - Conduct Unbecoming an Officer, and Section 2.22 - Quarreling with Other Employees or a Supervisory Officer in Public View.

24.     On September 14, 1999, I issued a written reprimand to Detective Barton in accordance with the recommendations of Lieutenant Killiany, Captain Kalwat and Chief DiVenere.

25.     At no time did I fabricate any allegations against Detective Barton concerning the August 31, 1999 incident.

26.     At no time was I encouraged by Detective Brian Suchinski to fabricate any

allegations or to take any disciplinary action against Detective Barton as a result of the

August 31, 1999 incident.

27.    At no time during my career with the Bristol Police Department was I a member or

supervisory officer of the Bristol Police Department Emergency Response Team.

28.    My position as Detective Sergeant did not place me in the chain of command of the

Emergency Response Team.

29.    My duties as Detective Sergeant did not include supervising the Emergency

Response Team, disciplining Emergency Response Team members or making decisions

concerning the removal of officers from the Emergency Response Team.

30.    In 1999, Captain Donald Kalwat was in command of the Emergency Response Team.

Decisions concerning the discipline of Emergency Response Team members were made by

Captain Kalwat with final approval by Bristol Police Chief DiVenere.

31.    I had no personal involvement in the decision to remove Detective Barton from the

Emergency Response Team.

Richard Mullaney
Bristol Police Department
Detective Sergeant, Retired

Subscribed and sworn before me this 29th day of July, 2003.

Notary Public
Commissioner of the Superior Court

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREW BARTON,<br>    Plaintiff | : | CIVIL ACTION |
| | : | |
| VS. | : | NO. 302CV1210(PCD) |
| | : | |
| CITY OF BRISTOL; AND IN THEIR INDIVIDUAL<br>AND OFFICIAL CAPACITIES, RICHARD MULLANEY<br>POLICE SERGEANT; BRIAN SUCHINSKI, POLICE<br>DETECTIVE; AFSCME LOCAL 3754; AND IN HIS<br>INDIVIDUAL AND OFFICIAL CAPACITY MELVIN<br>DEKOW, UNION PRESIDENT<br>    Defendants | :<br>:<br>:<br>:<br>:<br>:<br>: | |
| | | JULY 29, 2003 |

## AFFIDAVIT

I, Brian Suchinski, being duly sworn hereby depose and say:

1.      I am over the age of eighteen and understand the obligation of an oath.

2.      I am a defendant in the above-entitled action, and, as such, I have knowledge of the

facts surrounding the underlying claim.

3.      I became employed with the Bristol Police Department in 1974 as a Patrol Officer,

and in 1990, I was promoted to the rank of Detective.

4.      At various times between 1997 and 2000, I was assigned to the Bristol Police

Department Narcotics Enforcement Team where I worked with the plaintiff, Andrew Barton.

5.      On August 31, 1999, a joint narcotics investigation was conducted by the Bristol and

West Hartford Police Departments at Meineke Muffler, 114 Farmington Avenue in Bristol.

6.    Detective Barton and I both participated in the August 31, 1999 investigation.

7.    At no time did I make false allegations or encourage anyone else to make false allegations concerning Detective Barton's conduct during the August 31, 1999 investigation.

8.    At no time did I encourage Detective Sergeant Richard Mullaney to take disciplinary action against Detective Barton as a result of his conduct during the August 31, 1999.

9.    At no time during my career with the Bristol Police Department was I a member or supervisory officer of the Bristol Police Department Emergency Response Team.

10.   At no time have my duties as Detective included supervising the Emergency Response Team, disciplining Emergency Response Team members or making decisions concerning the removal of officers from the Emergency Response Team.

11.   I had no personal involvement in the decision to remove Detective Barton from the Emergency Response Team.

12.   I have never placed a rubber rat on Andrew Barton's desk.

13.   I have never intentionally hidden car keys from Andrew Barton.

14.   Cars used by detectives on the Narcotics Enforcement Team are not assigned to particular individuals.  Rather, each detective is entitled to use any car which is available on a particular day.

15.     I have never deliberately withheld a telephone message from Andrew Barton.

16.     I did not hang a poster of the character "Dr. Evil" from the "Austin Powers" movies on the union bulletin board at Bristol Police Headquarters.

17.     I have never purposefully kicked a plastic recycling barrel in Andrew Barton's presence.

Brian Suchinski, Detective
Bristol Police Department

Subscribed and sworn before me this 29th day of July, 2003

Notary Public /
Commissioner of the Superior Court

# BRISTOL POLICE DEPARTMENT
# INCIDENT REPORT

SUPPLEMENT

INCIDENT # 990831031

| | | |
|---|---|---|
| Incident Code | Officer: Lennon | |
| City | State | Apartment No. |

Type of Incident: Narcotics Arrest

Incident Location: 1114 Farmington Av. Meineke Muffler

Street No. / Street Name

| Status | Co-Complainant | Last Name | First Name | M.I. | Sex | Race | MoDay/Yr | Age | Telephone | Address | Reg., Op. or S.S. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 1 | Castillo | Guillermo | | M | H | 12/23/70 | 18 | 585-9390 | 80 Washington St. Apt. B-2 Bristol, Ct. | 041948354 |
| 0 | 2 | Burke | William | J | M | W | 04/22/49 | 50 | | 32 Martin Rd. Bristol, Ct. | |
| 0 | 3 | Rivera | Javier | | M | H | 05/23/66 | 33 | 583-9478 | 94 Putnam St. Bristol, Ct. | 176750076 |

| | Charge 1 | Statute | Charge 2 | Statute | Charge 3 | Statute | Charge 4 | Statute |
|---|---|---|---|---|---|---|---|---|
| 1 | Poss more than Kilo Mari | 21a-278(b) | Poss. Marijuana | 21a-279(c) | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |

Status Code: A=Abandoned E=Evidence F=Found L=Lost O=Other R=Recovered S=Stolen T=Towed V=Vehicle

| Status Code | Qty | Year | Item | Brand / Model | Vehicle Registration | Color | Characteristical Condition /Serial/VIN |
|---|---|---|---|---|---|---|---|
| E | | | See attached Supplement | | | | |

Sworn and subscribed before me, this __1st__ day of __Sept__, 1999.

_____ Sgt. of Police.

Off. Signature
Reviewed by Ptl. Shft. Comm.

On 08/30/99 I received a phone call from Det. William Kinahan of the West Hartford, Ct. Police Dept. Det. Kinahan told me that the West Hartford Police Dept. had information concerning a shipment of drugs that was supposed to be delivered to an address in Bristol. Det. Kinahan related the following information. On Friday 08/27/99 at approx. 0930hrs Det. Paul Melanson of the West Hartford Police Dept. received a phone call from John Faulise of Airborne Express Delivery Service located at 141 South St. in West Hartford to alert the West Hartford Police to Airborne Express' receipt of a suspicious 52 pound package. The package had been sent from "Yellow Toyota" located at 7 Silverado Lane in Los Angeles, Ca. with a return phone number of either 518-862-1861 or 518-862-4864. The package was to be sent to John Periony of 1114 Farmington Av. Bristol, Ct. with a phone number of 860-584-9551. The account was new to Airborne Express so employees checked and found that the phone numbers of the sender were not legitimate. They became concerned that the shipment may be narcotics related so they notified the police.

West Hartford Detectives attempted to verify the information on both the sender and the reciever of the package. It was found that the address and the business for a "Yellow Toyota" did not exist in the Greater Los Angeles area. Also that the area code for the return phone number (518) is for Schenectady, NY. One of the Phone numbers was found to be out of service and there was no answer at the other one. There is no "Yellow Toyota" listed in Schenectady, NY. to correspond to the area code.

Det. Melanson made a call to the number of the reciever, John Periony. The number was found to belong to Meineke Muffler at 1114 Farmington Ave. in Bristol, Ct. Det Melanson was told by Meineke Muffler personnel that there was no one there by the name of John Periony.

West Hartford Detectives then went to the Airborne Express office along with West Hartford Police Officer David Dubeil and his K-9 partner, Luke. Luke has been trained in narcotic detection. At 1140hrs Luke was presented with several boxes, including the suspect package. Luke alerted to the suspect package, indicating the probable presence of illegal drugs. West Hartford Detectives retained the suspect package and brought it to the Special Investigations Division of the West Hartford Police Dept. pending a search warrant. See attached copy of report by Officer Dubeil.

West Hartford Police sought and obtained a search warrant for the suspect package. See attached copy of West Hartford's search warrant and return of same. West Hartford Police examined the suspect package, a "Contico" ventilated storage shelf box bearing Airborne Express airbill number 6137288054 with the above listed "to" and "from" addresses. The box contained a Sterilite 48 qt. plastic container which contained five individually wrapped packages containing suspected marijuana. The weight of the 5 packages, including wrapping, is approx. 31.5 lbs.. The suspected marijuana was weighed and field tested by West Hartford Detectives. It field tested positive for marijuana. Det. Kinahan said that on Monday 08/30/99 Airborne Express received a phone call from a male with a Jamaican accent claiming to be a John Perry and wanting to know where his package that was to be delivered to 1114 Farmington Av. in Bristol, Ct. was.

Detectives from both Bristol and West Hartford collaborated in a joint investigation where it was decided that a controlled delivery of the package would be attempted. West Hartford Detectives removed four of the five wrapped packages of suspected marijuana from the "Contico" box. A single wrapped 6 pound package of suspected marijuana was left in the "Contico" box. The empty space in the box was then filled with newspapers and weights so that the box would be close to its original weight. The other four wrapped packages were removed from the box and remained at the West Hartford Police Dept. for security, in case something went wrong during the controlled delivery and the box was lost, only a small quantity of marijuana would be out on the streets. The "Contico" box was then resealed to appear as if it had not been opened.

| ff Signature | Pd. Shirt Comm. |
|---|---|
| Det. Kinahan — 0103 | Lt M.B |
| Reviewed By Sgt. | ID. NO. |

Sworn and subscribed before me. this 1st day of Sept 1999

Sgt R Mullany    Sgt of Police

Case 3:02-cv-01210-PCD    Document 67-2    Filed 10/15/2003    Page 13 of 29

990831031

On 08/31/99 Lt. Carl Rosenweig, Det. Paul Melanson, Det. William kinahan, and Det. Randy Law, all of West Hartford Police Dept. responded to the Bristol police Dept. They had in their possession the resealed "Contico" box containing the single 6 pound wrapped package of suspected marijuana. They had also borrowed an Airborne Express delivery van and uniform.

At approx. 1155hrs on 08/31/99 Det. Paul Melanson drove the Airborne Express delivery van into the parking lot of Meineke Muffler located at 1114 Farmington Av. Bristol, Ct.He was wearing the borrowed Airborn Express uniform, posing as the delivery van driver. Det. Melanson had the resealed "Contico" box containing the single 6 pound package of marijuana in the van. As Det. Melanson was exiting the vehicle, a male, later identified as Rivera, exited Meineke Muffler and approached Det. Melanson. Det. Melanson was wearing a hidden body microphone that was being monitored by Lt. Rosenweig, Det. Kinahan, Det. Suchinski, Det. A. Barton, and myself. Det. Barton was also videotaping the transaction from a hidden location.

When Rivera approached Det. Melanson, Det. Melanson told him that he had a package for John Perry. Rivera said "Yeah." Det. Melanson asked Rivera "Are you John Perry?" Rivera said "Yes." Det. Melanson had a clipboard and appropriate paperwork for Airborne Express when a delivery is made. Det. Melanson then told Rivera to sign the form and to print his first initial and last name in an adjacent box. Rivera signed "J. Perry" and printed "John Perry". Det. Melanson then used a hand truck to bring the "Contico" box inside of Meineke Muffler and left it in front of the counter. Det. Melanson then drove away. As he drove away Det. Law entered the store pretending to be a customer, so that the package could be observed. Det. Law spent a short time in the store engaging Rivera in conversation. Rivera did not go near the package. Det. Law then exited the store. The bays to the garage were open and it appeared that there were no customers in the store at this time. Detectives from both departments moved in and secured the building. There were three employees inside, Rivera, Burke, and Castillo. All three were initially handcuffed and separated for the safety of all parties involved. The scene was determined to be safe and all three parties were then uncuffed.

Based on the physical description provided by Det. Melanson, Det. Law, and Det. Barton, Rivera was singled out and separated from the other two employees. Rivera was told the reason for our presence. Rivera said that the other two employees had nothing to do with what was going on and knew nothing about the package. Rivera then said that he was just accepting the package for an acquaintance named "Eddie". Rivera said that he had already paged "Eddie" to let him know that the package had arrived. Rivera said that he was willing to cooperate with police to see if "Eddie" would come down and get the package from him.

"Eddie" did not return Rivera's page. Rivera said that he was going to try again and paged "Eddie" two more times. "Eddie" did not return any of Rivera's pages. At this time Rivera was placed under arrest and handcuffed. Rivera asked me if he could call his wife. I dialed the phone and held it to his ear for him. Rivera told his wife that he was being taken away because he had had some marijuana delivered to him. No one had told Rivera what was in the "Contico" box, and all police personnel on scene were careful not to mention what the box contained. Rivera had not opened the box, but knew what the contents were.

Rivera was transported to the Bristol Police Dept. The "Contico" box and 6 pounds of suspected marijuana were taken to the Bristol Police Dept. and placed into evidence. Rivera was processed through booking and Charged on UAR # 1114324 with Possession of More that One Kilo of Marijuana With Intent To Sell 21a-278(b) and Possession of Marijuana 21a-279(c). He was held on a $100,000. bond. During the entire incident Rivera was very cooperative. He was polite and did not give police a hard time.

| Off Signature | | Pt. Shift Comm. | |
|---|---|---|---|
| Reviewed By Sgt. | 003 | I.D. NO. | |

Sworn and subscribed before me this 1st day of Sept 1999

Sgt K Mulveny

990831031

Rivera said that he was willing to cooperate with police and was willing to give a statement. Rivera had been notified of his Constitutional Rights during the booking process. I again notified Rivera of his Constitutional Rights. Rivera signed a waiver of those rights and gave me a written statement.

Rivera's statement said, in part and among other things, that about 3 to 4 months ago a male that Rivera knows only as "Eddie" came to Meineke. The two got to know each other. A few weeks after meeting, "Eddie" asked Rivera if he would like to make some money on the side. "Eddie" explained that he would have a package delivered to Meineke. Rivera would sign for the package and then give it to "Eddie". Rivera would not have to know what was in the package and "Eddie" would pay him $1,000. Rivera would not know what name would be on the package or when one was coming. He would just sign for whatever name was on the package. Rivera had signed for packages for "Eddie" approx. 3 times, and was paid $1,000. for each. "Eddie" was always right there after the package was delivered to get it and told Rivera that he followed the Airborne Express vans from when they left the Airborne Express garage. Rivera said that he never asked "Eddie" what was in the packages but that he knew it was drugs by the way that "Eddie" was doing things.

On Thursday 08/26/99 "Eddie" called Rivera to tell him that a package would be coming in of Friday. The package did not come so Rivera paged "Eddie" to tell him. "Eddie" said that he was going to call Airborne Express to find out where the package was. Someone then called Rivera asking for John Perry. Rivera did not know that that would be the name on the package at that time so he told the caller that there was no one there by that name. The caller was actually Det. Melanson. "Eddie" then called Rivera back and told him that the name on the package was John Perry and if Airborne Express called to ask about the name, to confirm it.

On Monday the package did not show up. Rivera paged "Eddie" again and told him about the package. "Eddie" called Airborne Express and then called Rivera back to tell him that they had probably lost the package but to keep an eye out for it anyway. When the Airborne Express van pulled into the parking lot today, Rivera figured that the package was there. He went out to the van and when the driver asked if he was John Perry, Rivera said that he was and then signed for the package. Rivera said this was the biggest package he had received. He paged "Eddie" to let him know that the package had arrived. "Eddie" did not return his page.

The next thing was that the police came in and told Rivera what was going on with the package. Rivera told the police that he would cooperate and try to get "Eddie" to come get the package. Rivera tried paging "Eddie" several more time but he did not return the pages. Rivera was then arrested and handcuffed. He asked the police if he could call his wife. He told his wife that he was being taken in because he had some marijuana delivered to him.

Rivera said that the reason he did this was to provide for his wife and two year old son because he was having trouble keeping up with the bills. See attached waiver of Rights and statement by Rivera.

Det. Sgt. Mullaney went to the West Hartford Police Dept. with Det. Mendella to get the remaining four packages of suspected marijuana. The remaining four packages were transported to the Bristol Police Dept. and the entire amount was secured in the Bristol Police Dept. evidence vault.

The single 6 pound package of marijuana that was delivered to Rivera was field tested at Meineke Prior to Rivera being placed under arrest. The test was positive for the presence of Marijuana.

The investigation is continuing.

| Off. Signature | | Pt. Shift Comm. | |
|---|---|---|---|
| Det. Johnson    0103 | | | |
| Reviewed By Sgt.: Sgt Roy | | ID. NO. | |

BACK TO: Sworn and subscribed before me, this 1st day of Sept 1999

Sgt R. Mullaney        Sgt J. Palaia

990831031

## Evidence Taken

1-cardboard box (Contico plastic storage shelving)
1- 48 qt. plastic storage bin
5-plastic wrapped bundles each containing marijuana
   Package #1-approx. 6lbs
   package #2-approx. 7lbs
   package #3-approx. 9.5lbs
   package #4- approx.  3lbs
   package #5-approx. 6lbs
          Total weight approx. 31.5lbs

1-videotape of delivery to Rivera
1-packing slip receipt, that had been removed from "Contico" box after delivery and was found in
  Rivera's pocket following his arrest
1-Airborne Express "Cartage Record"  signed by Rivera in the name of John Perry
12-Polaroid photos taken by West Hartford Police of "Contico" box when they served their search
  warrant
1-Polaroid photo of single 6 lb bag of marijuana that was delivered to Rivera in "Contico" box

The above information is true and correct to the best of my knowledge.

Signed _Det. C. _____ #0103_

Signed and subscribed to before me on this _1st_ day of _Sept_ , 19 _99_

Signed _Det Sgt R Mullen_

_Sgt_ of Police

Off Signature _Det. Johnson_ ———— 0103
Reviewed By Sgt: _Sgt R Mj_
Swom and subscribed before me, this _1st_ day of _Sept 1999_
_Sgt R Mullen_ _Sgt of Police_
Pt. Shift Comm.
I.D. NO.
BRISTOL POLICE DEPT
NOV-25-2002 15:34

BRISTOL POLICE DEPARTMENT

TO: __Det Lt Killiany__   DAY __Frid__   DATE __09-03-99__   TIME _____

FROM: __Det Sgt Mullaney__

SUBJECT: __Det A Barton__         RE:Meineke Muffler Incident

On 08-31-99, Bristol Police detectives and West Hartford Police detectives set up a joint operation to conduct a controlled delivery of an intercepted shipment of marijuana that was sent Airborne Express to Meineke Muffler, located at 1114 Farmington Avenue in Bristol (RE: Incident Number 990831-031). During the operation, the delivery of marijuana was accepted and signed for by a Meineke Muffler employee, after which police converged on the business and proceeded with a follow up investigation. During this time, probable cause was developed which resulted in the arrest of the employee.

Just prior to placing the employee under arrest, I was in the bay/garage area of the business and was standing next to West Hartford Det Sgt Carl Rosenweig and Det Bill Kinahan. Also standing nearby was Bristol Det Brian Suchinski, as well as two Meineke employees. We were at a point where we were wrapping up the operation at the muffler shop when Det. Chris Lennon (case officer) approached and stated he wished to arrest the suspect by means of a warrant instead of doing so on scene. I began to discuss this with Lennon, stating I preferred to have the employee placed under arrest at this time. While talking to Lennon, Det. Andrew Barton approached our location and interrupted the discussion. He stated "we're going to arrest him with a warrant and not now" (or similar comment). I told Barton that we were going to go with an on scene arrest because of the probable cause at hand. Det Lennon had stated he would rather use a warrant, however complied when I told him what my preference was and ended the discussion after a brief period of time. Det. Barton continued to express his desire to obtain a warrant and I again told him the employee would be arrested on scene. He then walked away from my presence for a brief period of time, leaving me with the two West Ha___ ___ detectives. Det. Suchinski also observed this conversation. Meineke employees William Burke and Guillermo Castillo were also within earshot.

I then became involved in other activities in the garage area for a couple of minutes, after which I stood in the center of the bay area near the two West Hartford detectives, conversing with them. Dets.Lennon, Barton and Suchinski were all standing within close proximity to me and Castillo and Burke were in the bay area. Also standing nearby was the suspect employee, Javier Rivera. I spoke to Lennon about putting Rivera into custody at the scene. At this point, Det. Barton again engaged me in a conversation about using a warrant. He also appeared to be upset over the on scene arrest. I told Barton that the suspect would be arrested at the present time and he replied that this was not necessary,that we didn't have to effect an arrest now. I again told him that I decided that the person would be arrested at this time. I asked Barton what we would gain by using a warrant and he offered a vague answer and said we could tie up loose ends. I told him I didn't want to risk the suspect fleeing because of the magnitude of the incident and he would be arrested on scene. Barton continued to debate the on scene arrest, at one point attempting to offer an explanation of some sort about what the next steps of the investigation should be and why we should hold off on the arrest. I told him again that we would arrest the person on scene. During Barton's disputing of the arrest, he gradually became increasingly insistent about his opinion on the matter.

Page-2                          Det. A Barton
                                       RE: Meineke Muffler

Barton continued to remain upset, to the point where he was vigorously disputing my decision on the arrest. Det Barton did not actually disobey instructions because I had told Lennon to place the suspect into custody, however he hotly disputed the decision regarding the arrest and continued to do so. at which point I firmly told him that the suspect would be arrested at this time, that it was not open to debate and that this was the end of the discussion. Barton walked away at this point.

As mentioned, several people were present during this time. One of the West Hartford detectives mentioned above showed a reaction to Barton's conduct by means of a facial expression after Barton walked away. They had been watching Barton during the conversation. Det. Suchinski observed the incident and Det. Lennon was nearby within earshot. Three Meineke employees were present, including the suspect. During the incident, Barton showed poor control of himself, allowing himself to become upset and dispute my decision in view of numerous other people mentioned above. I had told him approximately four to six times (between two different discussions) the suspect would be arrested at this time and eventually I had to firmly tell him the conversation was over because he continued to try and argue the point. Each time I told him of my decision, Det Barton would continue to dispute the decision in an arrogant and argumentative manner which eventually caused a scene in front of people.

Since the incident described above, Det. Barton again showed a tendency to dispute a decision made by me. On Thursday, 09-02-99. NET and ERT were planning to serve two search warrants on Davis Drive. I informed Det. Lennon who I was going to use as the case officers on the two different warrant executions and also told him my reason for the decision. Det Barton was sitting nearby and he did not agree with what I had told Lennon. Det. Barton then stated to me. "you know, ordinarily we use the affiant on the warrant as the case officer--That's usually how we do the warrants" (similar). I told Barton I had a reason for the decision. He continued to dispute the decision by stating " well, that's not really very logical to use someone else". I again told him that the decision was made and was final.

As a result of Det. Barton's conduct, and in view of the fact that the incident at Meineke occurred in view of other police employees and business employees, the incident came to an embarrassing conclusion when I had to become firm with Barton. This seemed to have an adverse effect on what was a cooperative operation between members of two police department by disrupting the operation and creating an embarrassing conclusion to our efforts. This conduct also reflected unfavorably upon the Department in view of the other people present.

As a result of Det. Barton's conduct, he has violated two sections of the Bristol Police Department Code of Conduct as follows:

1) Sec. 2.22--Quarreling With Other Employees Or A Supervisory Officer In The
             Public View.
2) Sec. 1.00  Conduct Unbecoming An Officer

                                  Submitted By
                                  Det Sgt R Mullaney

September 10th, 1999

TO:    Chief J. DiVenere

FROM:    Lt. T.Killiany

SUBJECT:    Detective Andrew Barton

On Wednesday, September 1, 1999 Detective Sergeant Richard Mullaney approached me with a situation that arose on Tuesday, August 31, 1999 during a joint narcotics investigation with the West Hartford Police.  This situation involved the conduct of Detective Andrew Barton.  I directed Sergeant Mullaney to document the incident and submit his report to me for review.

Attached you will find Sergeant Mullaney's documentation of the incident at the Meineke Muffler Shop during the course of a drug investigation and narcotics arrest.

I have reviewed this report and spoken with Sergeant Mullaney concerning the incident and his report.  Det. Barton's behavior was totally inappropriate and bordered on insubordination.

Sergeant Mullaney explains that he was approached by the case officer, Det. Lennon, and a discussion took place concerning the arrest.  Sergeant Mullaney discussed the arrest with Lennon and Lennon followed Mullaney's instructions.  Det. Barton interrupted the discussion to provide his opinion on how the case should be handled.  Sergeant Mullaney listened to Barton and evaluated his opinion along with all the circumstances.  Sergeant Mullaney instructed Lennon and Barton that the arrest would take place as decided previously.  Barton continued to argue with Mullaney in full view of civilians and officers from another department. Not until Mullaney became very assertive, did Barton stop arguing.

This type of conduct can not be tolerated between a supervisor and a subordinate, especially in public view and in the presence of officers from another police department.  I believe Det. Barton was disrespectful to his supervisor in public view and crossed the line between offering his opinion and arguing with his supervisor.

I agree with Sergeant Mullaney's assessment of the situation, that Det. Barton violated two sections of the Bristol Police Department Code of Conduct.  At the very least, Det. Barton should be issued a written reprimand for violations of Sections 1.00 – Conduct Unbecoming an Officer and 2.22 – Quarreling With Other Employees or a Supervisory Officer in the Public View.

I agree w/ Killiany + Mullaney

I gree Captain

DwL
9/13/99

I concur.
Issue as suggested.
9/13/99



# BRISTOL POLICE DEPARTMENT

131 North Main Street
Bristol, CT  06010

August 20, 2002

TO :  Capt. Kalwat

FROM :  Det. Kevin Mellon

SUBJECT :  Meineke Muffler 8-31-99.

I was assigned to this incident involving the controlled delivery of a quantity of drugs through a carrier service that had been originally discovered by West Hartford Police. Det. Lennon was assigned as the actual case officer. As the Bristol end of the investigation commenced, the delivery was made to the muffler shop and was signed for by an employee. It appeared the employee would be signing for an outside suspect who did not work at the muffler shop. These officers moved in to seize the evidence and take the involved employee into custody and to try to lure the other outside suspect to the muffler shop.

There came a point at the muffler shop scene when it appeared that the attempt to lure the outside involved suspect would not be successful. Sgt. Mullaney and Det. Lennon were discussing this and the on-sight arrest of the involved muffler shop employee that Sgt. Mullaney had ordered.

At one point, Det. Andy Barton became involved in this discussion. Det. Barton apparently did not want to arrest the muffler shop employee at the time. Det. Barton became rather animated and louder in pressing his point of view on how the investigation should continue. Det. Barton's view and Sgt. Mullaney's view were different. Sgt. Mullaney wanted the employee arrested now. There was sufficient probable cause to arrest the employee at the time. Det. Barton continued to debate and dispute the arrest with Sgt. Mullaney, becoming more upset and vocal as he (Barton) went on. This happened in front of the West Hartford detectives and the other muffler shop employees who were not involved in the drug case. Sgt. Mullaney had to sternly advise Det. Barton that the decision was made to arrest the employee and the decision was final.

It reached a point where Ofc. Tavares and I decided to leave the muffler shop and the arrest debate. We went to make a sweep of the area roads in case the other outside involved suspect was lurking in the area or still on his way to pick up the drugs. That suspect was not located and the scene was eventually cleared and the employee brought into Police H.Q.

# EMPLOYEE REPRIMAND REPORT

Name __Andrew Barton__ Classification __Detective__ Department __Police__

Date _____ Time _____ Oral _____ Written __XXXXX__ Suspension _____ Discharge _____

Remarks __Article I, Sec. 1.00 Conduct Unbecoming an Employee__
__Article II, Sec. 2.22 Quarreling With Other Employees or a Supervisory Officer in__
__Public View__

Ref: Incident 990831031 Narcotics arrest 1114 Farmington Ave. Bristol

Det. Sgt. Mullaney's report dated September 3, 1999.

*(Remarks must be accurate and concise)*

__S. Barton__
Witness

Dept. Head/Supervisor __Sgt. R. Mullaney__
Sgt. R. Mullaney 9/14/99
(Please Print)

PERSONNEL DEPARTMENT COPY

BRISTOL POLICE DEPARTMENT

DAY <u>Wednesday</u>     DATE <u>09-15-99</u>     TIME _____

TO: <u>Det. Lt. Killiany</u>

FROM: <u>Det. Sgt. Mullaney</u>                                                  H

SUBJECT: <u>Discipline     RE: Det. A. Barton</u>

Sir;

    On 09-14-99, I issued Det. A. Barton a written reprimand regarding the incident at Meineke Muffler that I previously reported to you. The reprimand was for violations for Code of Conduct Article I, Section 1.00 and also Article II, Section 2.22.

    In addition, I have spoken to Det. Barton regarding his responsibilities while at work. It was explained to him that input from employees is acceptable and encouraged during the course of an investigation. He was informed that his level of input rose to the point where he engaged in arguing his point and caused a scene. He was further advised that once a decision is made by any supervisor, that it is his responsibility to comply with the decision at that time.

    Sgt. E. Osanitsch witnessed the issuance of the reprimand and the above discussion with Det. Barton.

## STOL POLICE DEPARTMENT

DAY  Friday DATE  10-01-99    TIME_____

TO:_          Det. R. Mendella

FROM:_        Det. A.J. Barton

SUBJECT:_     Greivence

      On or about Friday, 09-24-99, Capt. Kalwat called me into his office, and informed me he was removing me from the ERT Team. I would like to Grieve this.

Respectfully

Det. A.J. Barton

1      A      One captain was Captain Ahearn.

2      Q      Let me rephrase, who was the captain who was

3      involved in the decision-making process to put you on the

4      ERT?

5      A      Captain Ahearn.

6      Q      Hern?

7      A      A-h-e-a-r-n.

8      Q      And you said DiVenere was a lieutenant at the

9      time?

10     A      Correct.

11     Q      And he was involved in the process?

12     A      Correct.

13     Q      Was the chief at the time involved in the

14     process?

15     A      I believe so.

16     Q      Who was the chief at the time?

17     A      I believe it was Chief Khonke.  K-h-o-n-k-e, I

18     think.

19     Q      How many people were on the Emergency Response

20     Team when it was first formed?

21     A      I believe there were twelve.

22     Q      Did the assignment involve any change in pay?

23     A      The rate of pay remained the same.  It was

24     overtime for participation in either training or call-out

25     off shift.

1    Q    Do you know whether or not the City of Bristol

2    Police Department has a policy where overtime is equalized

3    out among detectives?

4    A    There is, yes.

5    Q    What's your understanding of that policy?

6    A    Then or now?

7    Q    We'll start with now.

8    A    There's been a change in the way Lieutenant

9    Killiany has to equalize the overtime amongst detectives.

10    Prior to this change, any overtime would be tracked if it

11    was EXT and counted towards the acquisition of overtime.

12    Q    You're going to have to explain what that means,

13    tracked in EXT?

14    A    Our overtime is defined differently for different

15    work.  If I come work on duty, say on the road, or in the

16    investigations division, that overtime is classified as EXT.

17    If I work a construction job directing traffic in the road,

18    or work a bingo or Stop & Shop, that's classified as EXD.

19    EXD does not count towards your equalization. It is not

20    counted towards equalization of overtime in the criminal

21    investigations division.  It's tallied in another manner.

22         For investigations, Lieutenant Killiany would

23    have to track all EXT which would be ERT, Emergency Response

24    Team, DARE, women's self defense, all the little programs in

25    which people would get EXT.  Those hours would be tallied

1    Q    Did Sergeant Mullaney tell you why he was

2    issuing the written reprimand?

3    A    I don't recall what was said when it was issued.

4    I believe there was some explanation with it; I don't recall

5    exactly what it was.

6    Q    What did the reprimand say; what was the

7    reprimand for?

8    A    I don't recall.

9    Q    Who do you believe made the decision to remove

10   you from the Emergency Response Team?

11   A    I don't know.

12   Q    Do you know who is in charge of the Emergency

13   Response Team?

14   A    Captain Kalwat oversees the Emergency Response

15   Team.  Sergeant Osanitsch was a team leader for the

16   Emergency Response Team.  Ultimately, the chief of police

17   has final say in any decisions which occur.  Who had the

18   final say in this, I don't know.

19   Q    You don't know who had final say?

20   A    No.

21   Q    To your knowledge was Sergeant Mullaney involved

22   in the decision to remove you from the Emergency Response

23   Team?

24   A    I have no idea.

25   Q    To your knowledge was Officer Suchinski involved

1    in the decision to remove you from the Emergency Response

2    Team?

3        A    I don't believe it would be something that would

4    be, he would be in that chain.

5        Q    To your knowledge was Mr. DeKow involved in the

6    decision to remove you from the Emergency Response Team?

7        A    I have no idea.

8        Q    To your knowledge was Chief DiVenere involved in

9    the decision to remove you from the Emergency Response Team?

10       A    It's probable.

11       Q    Based on what?

12       A    Him being the chief and having the final say.  If

13   he felt that it was improper, he would have refused that to

14   take place.

15       Q    Well, that's a different question then whether or

16   not he's the one who decided to remove you from the

17   Emergency Response Team, isn't it?

18       A    I believe so.

19            I do not know who had the say, I do not know who.

20       Q    Okay.  You have no personal knowledge one way or

21   another whether or not Chief DiVenere was involved in that

22   decision?

23       A    Correct.

24       Q    Can you also refer to Section 1.0 of the code of

25   conduct and tell me what is the maximum penalty for first

1    Rob Mendella told Captain Kalwat, "Don't take
2    Detective Plasczynski out.  Take out Brian Suchinski.  He's
3    a problem and people can't get along with him."
4    Q    Is it your testimony that Suchinski has treated
5    you differently by placing a rubber rat on your desk?
6    A    That was the beginning.
7    Q    Do you know for a fact, do you have any evidence
8    that Suchinski placed the rubber rat on your desk?
9    A    No, I don't.
10    Q    Did anyone tell you that Suchinski placed the
11    rubber rat on your desk?
12    A    No, they did not.
13    Q    Other than the rubber rat, how else has Suchinski
14    treated you differently?
15    A    Kevin Mellon had been assigned to the narcotics
16    unit.  He had a desk in the narcotics unit.  Detective
17    Suchinski had a spare key to that desk.  When Detective
18    Mellon left, Detective Mendella occupied that desk.
19    We had a loner car -- We operated with unmarked
20    vehicles for the most part in narcotics.  We had a loner car
21    which was an Infiniti, and there were two sets of keys.  And
22    the way the usage of these cars would work is when you'd
23    come in, you'd grab whatever set of keys to whichever car
24    you'd want.  Sometimes I would be the first person in the
25    office and I would go to get the keys to the Infiniti and

1    they wouldn't be there.

2             Time after time after time Detective Mendella

3    found them locked in his desk.  And he even mentioned to me

4    how Brian would retrieve the keys from his desk.  Therefore,

5    I would not be able to use the car.

6             Detective Suchinski then went to see Sergeant

7    Mullaney and related this problem with the cars to the point

8    where Sergeant Mullaney instructed me that that was not my

9    personal vehicle.

10        Q    Is that it?

11        A    Just for that?

12        Q    Yeah, for this incident?

13        A    Yes.

14        Q    Were you present when Suchinski went to

15   Mullaney?

16        A    No.

17        Q    Do you know what was said?

18        A    No.

19        Q    Where were the keys normally kept if they weren't

20   in Mendella's desk?

21        A    I'm not sure exactly, but they would either be in

22   a pile on a desk or cabinet or hanging on hooks, magnetic

23   hooks, or both.

24        Q    How did it affect you; how was your job affected

25   or was your job affected by not having access to the keys?

1    A    The inability to have that vehicle accessible to

2    me, and that was the best vehicle in the office, the one

3    that ran that everything worked on. It's nice to get into a

4    clean car that runs to do your job.

5    Q    Were other vehicles available?

6    A    Sometimes.

7    Q    Can you recall an instance when another vehicle

8    was not available that you needed one?

9    A    There were many instances. I cannot give you

10   specific dates. And I say that because of the disrepair of

11   those vehicles. Many times I had no vehicle to even leave

12   the station.

13   Q    Were there any assignments that you couldn't get

14   to because you didn't have a car?

15   A    I don't recall.

16   Q    Do you have any evidence of who put the keys or

17   who locked the keys in Mendella's desk?

18   A    From what Detective Mendella has said.

19   Q    Which is only that Brian would sometimes

20   retrieve the keys from his desk?

21   A    Yes. Which to me meant Brian knew, Detective

22   Suchinski knew the keys were in the desk to begin with.

23   And, excuse me, and that detective Mendella said, "I didn't

24   put them here. I don't know how they got in here."

25   Q    How else has Suchinski treated you differently?