FORSYTHE v. AMBROGIO, No. CV 97-0404059S (Jun. 28, 2001) 10/15/2003 Page 1 of Page 1 of 6
Case 3:02-BR-00200-RC-DV 9 Document 86-7 Filed 10/15/2003 Page 1 of 12

Connecticut Trial Ct. Unpublished Decisions        K

FORSYTHE v. AMBROGIO, No. CV 97-0404059S (Jun. 28, 2001)

KENNETH FORSYTHE v. JOHN AMBROGIO, et al.

2001 Ct. Sup. 8756

No. CV 97-0404059S

Superior Court

Judicial District of New Haven at New Haven.

June 28, 2001

### RULING ON MOTIONS FOR SUMMARY JUDGMENT (#124 and #127)

LAGER, JUDGE.

This is an action in two counts in which the plaintiff Kenneth Forsythe ("Forsythe") alleges that the defendant John Ambrogio ("Ambrogio"), in his capacity as chief of police of the Town of Hamden, intentionally inflicted emotional distress and discriminated against him for filing a claim for workers' compensation benefits in violation of General Statutes § 31-290a. See Complaint dated August 11, 1997. The plaintiff makes the same claims against the defendant Town of Hamden ("Hamden") under a theory of vicarious liability. See Amended Complaint as to Town of Hamden dated December 29, 1997. Ambrogio has moved for summary judgment on the complaint against him (#124). Hamden has also moved for summary judgment (#127). For the reasons stated below, the court grants Ambrogio's motion for summary judgment on the complaint. Since the action against Hamden is premised on a theory of vicarious liability, the court grants Hamden's motion for summary judgment as well.
CT Page 8757

Summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) Hertz Corp. v. Federal Ins. Co., 245 Conn. 374, 381, 713 A.2d 820 (1998). The moving party has the burden of demonstrating the absence of a genuine issue of material fact, but the party opposing the motion must provide evidence to demonstrate the existence of such an issue. Appleton v. Board of Education, 254 Conn. 205, 209, 757 A.2d 1059 (2000); Maffucci v. Royal Park Ltd. Partnership, 243 Conn. 552, 554-55, 707 A.2d 15 (1998).

Ambrogio has submitted extensive documentation in support of his motion for summary judgment including numerous interoffice memoranda, a statement given by Forsythe on June 3, 1997, correspondence, the minutes of a June 11, 1997 meeting of the Hamden Board of Police Commissioners, the transcript of Forsythe's deposition taken on March 17, 2000 and Ambrogio's affidavit dated December 14, 2000. Forsythe has not submitted any affidavits or other proof in opposition, but does cite to and rely upon certain pages of his deposition in his memorandum in opposition to

the motion for summary judgment.[fn1]

"In order to surmount a motion for summary judgment, a party must demonstrate that there exists a genuine issue of material fact. . . . Demonstrating a genuine issue requires a showing of evidentiary facts or substantial evidence outside the pleadings from which material facts alleged in the pleadings can be warrantably inferred. . . . A material fact is one that will make a difference in the result of the case. . . . To establish the existence of a material fact, it is not enough for the party opposing summary judgment merely to assert the existence of a disputed issue. . . . Such assertions are insufficient regardless of whether they are contained in a complaint or a brief. . . . Further, unadmitted allegations in the pleadings do not constitute proof of the existence of a genuine issue as to any material fact. . . . (Internal citations omitted)." New Milford Savings Bank v. Roina, 38 Conn. App. 240, 244-45, 659 A.2d 1226 (1995).

Ambrogio has met his burden of demonstrating the absence of a genuine issue of material fact and Forsythe has failed to provide an evidentiary foundation demonstrating the existence of a genuine issue of fact. The pertinent facts are as follows: Forsythe was an officer of and Ambrogio was the chief of the Hamden Police Department during all relevant times. On April 1, 1997, while he was out of work on injury leave for which he was receiving workers' compensation benefits, Forsythe suffered burns on
CT Page 8758
his back at home and placed two telephone calls to the dispatcher at central communications at the Hamden Police Department to request an outside line for Hamden Fire Station 2. (Exs. D, J, M p. 22). Outside lines are not recorded. (Ex. N). In a separate recorded call on the same date between the fire dispatcher. and an unidentified firefighter, the latter stated that Forsythe "was moving a hot water heater and he, I don't know if he dropped some water on his back or something and he may have burned. . . ." (Ex. D.) Captain Gustav Gertz subsequently advised Ambrogio of this information and Ambrogio referred the matter to the Internal Affairs Division of the Hamden Police Department for an investigation of possible violations of departmental rules and policies. (Ex. N). An investigation was conducted between April 9 and 23, 1997. (Ex. A, B, C, E, F). On April 28, 1997, Ambrogio wrote a letter to Forsythe advising that formal charges against him were being forwarded to the Hamden Board of Police Commissioners ("board") based on the incident of April 1, 1997. (Ex. G). This was a few weeks before Forsythe was scheduled for shoulder surgery on May 12, 1997, and notice of the charges "kind of weighed on [him] mentally." (Ex. M, p. 50).

Further investigation of the April 1, 1997 incident occurred after the referral to the board, including the taking of Forsythe's statement on June 3, 1997. (Ex. I, J, K). On June 11, 1997, Deputy Chief Riccitelli reported to the board that, due to additional information, the complaint against Forsythe had been withdrawn. (Ex. L). Forsythe was never brought before the board on these charges and no actions were taken against him. (Ex. M, p. 49). When the charges were dropped, the initial stress on Forsythe was lifted. (Ex. M, p. 51). Forsythe returned to work full-time after he recovered from his shoulder surgery. (Ex. M, p. 52). In October 1997, just before he was scheduled to return to work, Forsythe talked with JoAnn Donegan, who is a psychologist or psychiatrist for the town run EAP about "stress, being a police officer having a family, being worried about providing for them" and also about the "anxiety of going back to work." (Ex. M, pp. 52-55). Forsythe has not taken medications for any psychological issues and has not suffered from any distress which affected his ability to perform his job, do chores around the house or take care

of his children. (Ex. M, p. 56, 58, 59-60).

## I. Intentional Infliction of Emotional Distress

There are four elements which a plaintiff must establish to prevail on a claim of intentional infliction of emotional distress. "It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff
CT Page 8759
was severe." (Internal quotation marks omitted.) Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986). Liability requires conduct exceeding *all bounds* usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. (Emphasis in original; internal quotation marks omitted.) Id., 200 Conn. 254 n. 5, quoting W. Prosser & W. Keeton, Torts (5th ed. 1984) § 12, p. 60. "Whether the defendant's conduct and the plaintiff's resulting distress are sufficient to satisfy . . . these elements is a question, in the first instance, for [the] court." (Internal quotation marks omitted.) Ancona v. Manafort Bros., Inc., 56 Conn. App. 701, 712, 746 A.2d 184 (2000).

As a matter of law, Ambrogio's conduct was not extreme and outrageous. The undisputed facts establish that Ambrogio acted in a reasonable manner in seeking to conduct an investigation regarding the facts of the April 1, 1997 incident after he learned that Forsythe sought an unrecorded outside line to the fire department and that at least one person had reported that Forsythe, who was out with a work-related injury and was awaiting shoulder surgery, had moved a hot water heater. Ambrogio did not forward formal charges to the Hamden Board of Police Commissioners until these allegations were investigated. Further, the charges were withdrawn from the board's consideration shortly after the police department had an opportunity to interview Forsythe to learn his version of the events.

Forsythe, however, has argued that there was a pattern of acts taken against him by Ambrogio that amount to extreme and outrageous conduct and he relies on certain pages of his deposition to support this argument (Ex. M, pp. 39-40, 50-51, 62). This evidence does not demonstrate any pattern of extreme and outrageous conduct. At pages 39-40, Forsythe testified that he was told in 1989, when he was still in the police academy, that the chief was trying to fire him and two others. At pages 50-51, Forsythe asserted that he felt he was working for "someone that's looking to get me and had been . . . from the date I was hired in 1989," and he made a similar assertion at page 62. Such conclusory assertions do not rise to the level of substantial evidence to raise a genuine issue of material fact regarding the allegation of a pattern and practice of extreme and outrageous actions.[fn2] Moreover, even if these assertions provided a sufficient evidential basis of a pattern and practice, as a matter of law they do not amount to extreme and outrageous conduct. *Compare* Anacona v. Manafort Bros., Inc., supra, 56 Conn. App. 712-13 (finding insufficient a course of conduct including failure to abide by an oral promise, shadowy procurement of a check, issuance of exorbitant demand letter, pursuance of prejudgment remedy on a false application and pursuance of a breach of contract action) *with* Bell v. Board of Education, 55 Conn. App. 400, 410-11, 739 A.2d 321 (1999) (finding sufficient allegations of an atmosphere of chaos, disruptiveness,
CT Page 8760
physical and verbal violence and a school as a "place of fear" with

conduct occurring for two years). Generally, "an employment dispute between an allegedly harsh supervisor and an employee does not form the basis for a claim of intentional infliction of emotional distress." DeLeon v. Little, 981 F. Sup. 728, 738 (D.Conn. 1997).[fn3]

Additionally, as a matter of law any emotional distress that Forsythe may have suffered as a result of Ambrogio's conduct does not rise to the level of severity required for this tort. "[E]motional distress is severe where it reaches a level which no reasonable person could be expected to endure." (Internal quotation marks omitted; internal citation omitted.) Almonte v. Coca-Cola Bottling Co. of N.Y., Inc., 959 F. Sup. 569, 575 (D.Conn. 1997). Forsythe testified that the referral of the charges weighed on him mentally, however, he also testified that the initial stress was lifted when the charges were dropped. This is insufficient. See Barry v. Posi-Seal International, Inc., 36 Conn. App. 1, 19-20, 647 A.2d 1031 (1994) (testimony that discharge was embarrassing and humiliating insufficient). Forsythe has not come forward with an evidential basis to demonstrate that he suffered any symptoms of emotional distress to the "extraordinary degree" required to defeat the motion for summary judgment. See Almonte v. Coca-Cola Bottling Co. of N.Y., Inc., supra, 959 F. Sup. 576.

## II. Retaliation

"General Statutes 31-290a was designed to protect plaintiffs who file for workers' compensation benefits and is in essence a statutorily created tort deriv[ed] from the action for wrongful discharge set forth in Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 427 A.2d 385 (1980)]." (Internal quotation marks omitted; internal citations omitted.) Chiaia v. Pepperidge Farm, Inc., 24 Conn. App. 362, 365-66, 588 A.2d 652 (1991). To make out a prima facie case under § 31-290a, an employee "must present some evidence from which a trier of fact could infer that the employer discharged or discriminated against the employee because he or she had exercised his or her rights under the Workers' Compensation Act." Id. 24 Conn. App. 366. This cause of action requires some proof of an improper motive. Id. It also requires proof of an adverse employment action causally connected to the exercise of rights under the Act.

Forsythe has failed to come forward with an evidential basis upon which the court could conclude that he would be able to establish a prima facie case of a § 31-290a violation. Ambrogio has submitted an affidavit in which he avers that he "did not act with any intent to discriminate or retaliate against Kenneth Forsythe for filing a worker's compensation claim when I referred the matter . . . for investigation." (Ex. N.) The other documentation Ambrogio has filed in support of his motion for
CT Page 8761
summary judgment reveal that Ambrogio was aware of sufficient facts, suggesting that Forsythe had acted in a manner inconsistent with his work-related injury, to undertake an investigation to determine whether Forsythe had violated any rules or regulations of the Hamden Police Department. It was appropriate for Ambrogio to undertake such an investigation in his capacity as chief of police. Forsythe has not filed any opposing documentation which raises a genuine issue of material fact about whether Ambrogio acted with the requisite improper motive. It is appropriate t6 grant summary judgment on the issue of improper motive in case like this "in which the documentation filed illuminates the issue involved and reveals the lack of a genuine issue of material fact of intent when viewed in the circumstances of the case." Nolan v. Borkowski, 206 Conn. 495, 506, 538 A.2d 1031 (1988).

Furthermore, there is no evidence that Forsythe suffered an adverse employment action. Although Ambrogio forwarded charges to the Hamden Board of Police Commissioners, the charges were withdrawn after the police department had an opportunity to interview Forsythe and obtain his version of the events. Thus, Forsythe was never brought before the board on the charges and no actions were taken against him.

### III. Vicarious Liability

In his amended complaint dated December 29, 1997 against the Town of Hamden only, Forsythe seeks to hold Hamden responsible for the actions of Ambrogio on a theory of respondeat superior. Although Hamden has moved for summary judgment on a number of grounds, the court's conclusion that Ambrogio, the alleged primarily liable tortfeasor, is entitled to summary judgment on the complaint against him compels the conclusion that Hamden is likewise entitled to summary judgment on the complaint against it because its vicarious liability has been extinguished. See Alvarez v. New Haven Register, Inc., 249 Conn. 709, 720-24, 735 A.2d 306 (1999).

### IV. Conclusion

For the foregoing reasons, the defendant Ambrogio's Motion for Summary Judgment (#124) is granted and judgment shall enter for the defendant Ambrogio and against the plaintiff Forsythe on the complaint dated August 11, 1997. Likewise, the defendant Town of Hamden's Motion for Summary Judgment (#127) is granted and judgment shall enter for the defendant Hamden and against the plaintiff Forsythe on the complaint dated December 29, 1997.

LINDA K. LAGER, JUDGE

CT Page 8762

[fn1] In the memorandum, the following pages of transcript were cited: pages 39, 40, 43, 50, 51, 52, 53, 54, 55, 59, 62, 79. Counsel for Forsythe represented that these citations as well as any facts asserted in the memorandum are the evidence upon which he relies to indicate a genuine issue of material fact. The memorandum also referred to two pages of the plaintiffs responses to supplemental interrogatories and requests for production, but these were not provided to the court.

[fn2] In the first count of his complaint, Forsythe has alleged that Ambrogio intentionally inflicted emotional distress on him by engaging "in a pattern and practice of extreme and outrageous actions designed to cause the plaintiff to suffer emotional distress and leave his job. As a part of the said pattern of wrongful conduct, Ambrogio caused disciplinary actions to be brought against the plaintiff under circumstances where no such action would have been taken against any other similarly situated officer and has refused commendations and awards to the plaintiff under circumstances where such commendations and awards would have been given to any other similarly situated officer." (¶ 4). He has not brought forward evidence that supports this allegation.

[fn3] Forsythe also claims, in paragraph 10 of his complaint, that in June 1997, Ambrogio caused him to be denied an annual 4% bonus to which he was entitled as a certified Emergency Medical Technician and claims that the defendants have failed to come forward with facts to refute this allegation. Taking this allegation as true, it does not rise to the level of intentional infliction of emotional distress. Moreover, Forsythe's deposition testimony, submitted by Ambrogio in support of his motion for

summary judgment, reveals that Forsythe did not have an up-to-date certificate in July 1997, when the bonuses were paid, because he had been unable to take the recertification test while he was recovering from his shoulder surgery. (Ex. M, pp. 65-67). Further, Forsythe had no idea whether Ambrogio was involved in a subsequent refusal to award him a prorated bonus, although Forsythe did file a union grievance about the refusal that was denied as untimely (pp. 68-70).

Copyright © 2003 Loislaw.com, Inc. All Rights Reserved

```
 1        UNITED STATES DISTRICT COURT
 2              DISTRICT OF CONNECTICUT
 3     - - - - - - - - - - - - - - - x
 4     ANDREW BARTON,
                 Plaintiff,
 5                                         Civil Action
       vs.                                NO. 3:02CV1210(PCD)
 6
       CITY OF BRISTOL, ET AL,
 7              Defendants.                APRIL 10, 2003
 8     - - - - - - - - - - - - - - - x
 9              DEPOSITION OF ANDREW BARTON
10     APPEARANCES:
11          BREWER & O'NEIL, LLC
                Attorneys for the Plaintiff
12              818 Farmington Avenue
                West Hartford, Connecticut 06119
13              (860) 523-4055
            BY: ERIN I. O'NEIL, ESQUIRE
14
            HOWD & LUDORF
15              Attorneys for Defendants City of Bristol
                    and Chief DiVenere
16              65 Wethersfield Avenue
                Hartford, Connecticut 06114-1190
17              (860) 249-1361
            BY: ALEXANDRIA L. VOCCIO, ESQUIRE
18
            KERNAN & HENRY, LLP
19              Attorneys for
                    Defendants Richard Mullaney
20                  and Brian Suchinski
                207 Bank Street
21              P.O. Box 2156
                Waterbury, Connecticut 06722-2156
22              (203) 756-8961
            BY: JOHN K. McDONALD, ESQUIRE
23
24
                        NICOLE M. GOSSELIN
25                      REGISTERED PROFESSIONAL REPORTER
                        CONNECTICUT LICENSE NUMBER: 00084
```

1   A   I don't know why he allowed my reprimand and
2   removal from the SWAT team.  I have my opinions, but I don't
3   know why he did.
4   Q   What are your opinions?
5   A   If I was one of the chosen, one of the
6   looked-up-to individuals in the police department, it never
7   would have happened.
8   Q   What do you mean by that?
9   A   There are those people who can say and do almost
10  anything and nothing happens to them, relatively.  People
11  like myself can get disciplined, too bad.
12  Q   During your employment, throughout your
13  employment with the Bristol Police Department have you ever
14  been suspended?
15  A   Yes.
16  Q   When?
17  A   Maybe late 1980s.
18  Q   Why were you suspended?
19  A   Motor vehicle accident.
20  Q   What happened?
21  A   I was responding to a call --  I think, but I was
22  responding to a call and a car cut me off, and I got into an
23  accident with the car.  And with the police cruiser and that
24  car.  I don't recall what my punishment was, but I had two
25  days of suspension held in abeyance.

1      Prior to the time that that could be dismissed, I
2  backed into a piece of steel, I believe, coming up out of
3  the ground, punctured a gas tank in the car, and I think
4  this was the incident and I received maybe one day off.  But
5  I don't recall exactly.
6      Q    Any other suspensions?
7      A    I don't think so.
8      Q    Other than the reprimand stemming from this
9  narcotics investigation, have you ever formally been
10 reprimanded on any other occasion?
11     A    Yes.
12     Q    When?
13     A    I'm not sure.
14     Q    By who?
15     A    Different supervisors.
16     Q    Do you recall any of the reprimands?
17     A    I think one was one day I was opening my car door
18 or I was driving out and somebody was opening the car door,
19 minor damage.  Captain Kalwat wrote me up for abuse of sick
20 time.
21          I know there's others.  I can't think of the
22 specifics of them.
23     Q    Do you know when Captain Kalwat wrote you up for
24 the abuse of sick time?
25     A    In 1997 when my wife was giving birth, or about

BRISTOL POLICE DEPARTMENT                                          m

TO:     Chief John Divenere

FROM:   Capt. D.W. Kalwat

DATE:   12/5/97

Re: ERT Probation of Det. Andrew Barton

On 12/5/97 I placed Det. Andrew Barton on a 6 month ERT probation.

The probation stems from potentially embarrassing remarks made by Barton at the Smith & Wesson Academy and for an embarrassing display of attitude at a training demonstration with Southington PD.

In July Barton was issued a reprimand for Abuse of Sick Time.

ERT members are expected to set positive examples for other officers, Barton's behavior has not.

On this date I spoke extensively with Barton and found that he very much wants to be on the ERT and that he is fully co operative and the behavior especially that regarding attitude and remarks were not meant to embarrass the team or the department and I do not expect a re occurrence.

N

BRISTOL POLICE DEPARTMENT

TO:   Capt. Kalwat

FROM: Sgt E. Osanitsch

DATE: 10-9-98

    As per our conversation, enclosed is the information requested on the performance of Detective A. Barton as concerning to the Emergency Response Team.

    During the past two calender years Det. Barton has missed four training sessions and two ERT call outs ( on one arriving after the situation was resolved ).

    On Sept. 3,4, 1998 the ERT was activated and assigned to execute a NET search warrant. Detective Barton was the lead NET investigator and provided the team with a briefing of the situation. A number of team members expressed that they were shocked at the quality and content of the briefing. Comments made by Det. Barton, such as, " This is a minor deal " , " I want this to be low key so nobody notices the team out there " and " The main target is the first floor, they are dealing pounds ( when the search warrant was for the 1st floor ) shows lack of understanding as to what the mission of the ERT is. A major concern of mine is that Det. Barton failed to inform the team that the person listed in the search warrant had armed encounters recently with other drug dealers, one in which shots were fired. This would be unacceptable conduct from any department member, let alone an ERT member.

    On 9-2-98 Det. Barton split his normal work shift so that he could collect four hours overtime for training that day. The splitting of the shift appears in violation of a direct order issued by Det. Lt. Killiany stating CID members could not split shifts for ERT with out his prior approval. Assistant Team Leader Sgt. Grimaldi investigated this incident on request of the Chief and found that Det. Barton was informed of this " no splitting shift " policy after a similar incident 5-12-98. It appears that this incident is not an ERT issue at this time but an issue within CID.

    During the month of September 1998 Det. Barton stated he no longer wished to conduct any training for the Department. This negatively impacted the teams Chemical / Def-Tec Training.

page 2

On 12-5-97 Det. Barton was placed on a six month ERT probation for making embarrassing remarks at Smith & Wesson Academy.

These incidents raise a number of concerns and I request that we schedule a meeting with the Team Leaders after the next training session.

Respectfully,


Sgt. Osanitsch