A

```
1    UNITED   STATES   DISTRICT   COURT
2              DISTRICT OF CONNECTICUT
3    - - - - - - - - - - - - - - - x
4    ANDREW BARTON,                  :
5              Plaintiff,            :        Civil Action
                                     :     NO. 3:02CV1210(PCD)
6    vs.                             :
7    CITY OF BRISTOL, ET AL,         :        APRIL 10, 2003
              Defendants.            :
8    - - - - - - - - - - - - - - - x
9              DEPOSITION OF ANDREW BARTON
10   APPEARANCES:
11        BREWER & O'NEIL, LLC
12             Attorneys for the Plaintiff
               818 Farmington Avenue
13             West Hartford, Connecticut 06119
               (860) 523-4055
14        BY:  ERIN I. O'NEIL, ESQUIRE
15        HOWD & LUDORF
               Attorneys for Defendants City of Bristol
16                 and Chief DiVenere
               65 Wethersfield Avenue
17             Hartford, Connecticut 06114-1190
               (860) 249-1361
18        BY:  ALEXANDRIA L. VOCCIO, ESQUIRE
19        KERNAN & HENRY, LLP
               Attorneys for
20             Defendants Richard Mullaney
                   and Brian Suchinski
21             207 Bank Street
               P.O. Box 2156
22             Waterbury, Connecticut 06722-2156
               (203) 756-8961
23        BY:  JOHN K. McDONALD, ESQUIRE
24                  NICOLE M. GOSSELIN
25                  REGISTERED PROFESSIONAL REPORTER
                    CONNECTICUT LICENSE NUMBER:  00084
```

1          A     I believe there's a committee.  I'm not really

2     sure how that decision was made.

3          Q     Do you know who is on the committee?

4          A     Back then, I don't know.  I don't remember.

5          Q     Do you know who issued the letters of recognition

6     that you received since being a police officer with the City

7     of Bristol?

8          A     I don't recall.

9          Q     Do you recall any of them?

10         A     No.

11         Q     Do you recall what they're for?

12         A     For my role and the role of others involved in

13    incidents that occurred, criminal arrests, investigations,

14    and things similar to that.

15         Q     When did you begin your employment with the City

16    of Bristol?

17         A     1986.

18         Q     Where did you work prior to that time?

19         A     Right before that, I was working at Lake

20    Compounce.

21         Q     How long did you work at Lake Compounce?

22         A     A couple of years, on and off, I think.

23         Q     What did you do there?

24         A     When I originally started working for them, I

25    worked as a ride operator.  And then did some maintenance

1    and then finished up in the security department.

2           Q    Why did you leave that employment?

3           A    Because of the job offer for the City of Bristol.

4           Q    When did you apply for the position with the City

5    of Bristol?

6           A    I'm not sure.  It was either the end of '95 or

7    the beginning of '96.  I'm sorry, the end of '85 or the

8    beginning of '86.

9           Q    Do you recall what the application process

10   entailed?

11          A    I believe there was an application to the

12   personnel department.  And then the testing phase.

13          Q    And what was the testing phase?

14          A    There was a written test, physical agility test,

15   a medical exam, and at least one oral interview.

16          Q    Who was the oral interview with?

17          A    There was one oral interview with the police

18   commissioners.  And I don't recall about the other one.  If

19   there was another one.

20          Q    Did you interview with the chief of police when

21   you applied for the job?

22          A    I don't recall.

23          Q    Do you recall who offered you the job?

24          A    I don't recall.

25          Q    What was your position when you first began

1    working for the Bristol Police Department?

2        A    I was a patrolman.

3        Q    Who was your immediate supervisor at that time?

4        A    I'm not sure.  It could have been Sergeant

5    Watson.  Who is a lieutenant now.

6        Q    How long was he your supervisor for?

7        A    I don't think it was very long because then I got

8    moved to another shift.

9        Q    Who was your supervisor after you moved to

10   another shift?

11       A    I believe it would be at the time Sergeant

12   Moskowitz who is now also a lieutenant.

13       Q    How long did you hold the position of patrolman?

14       A    Until 1997.

15       Q    What position did you hold in 1997?

16       A    I was promoted to detective.

17       Q    What is the process by which someone's promoted

18   to detective?

19       A    There's a written test and then an outside oral

20   examination.

21       Q    For the outside oral examination, officers from

22   other towns are coming in and interviewing you; is that

23   correct?

24       A    A panel of three individuals of varying ranks.

25       Q    But are they from other towns?

1      A    I'm not sure, but I believe there was one
2  supervisor.
3      Q    Who was that?
4      A    Sergeant Peter Barton.  Four or five
5  investigators.  And then there was an officer who was
6  assigned to statewide narcotics task force.
7      Q    Is that it?
8      A    And that's all I can remember.
9      Q    The four or five investigators, were those all
10  detectives?
11      A    Yes.
12      Q    Who were they in 1997?
13      A    I'm not sure.  I believe Dave Carello, Dave
14  Plasczynski, Brian Suchinski, possibly Rob Mendella, and I'm
15  not sure about Kevin Mellon, he may have been on statewide
16  at the time.
17      Q    And you were assigned to the narcotics unit?
18      A    I was assigned in investigations originally.
19      Q    When did you get assigned to the narcotics unit?
20      A    Maybe August or September of '97.
21      Q    Do you know who made the decision to assign you
22  to narcotics?
23      A    I'm not sure who made the decision, but I know
24  Captain Kalwat had a say in it.
25      Q    Forgive me, I know nothing about police work, so

1    A    I was not given a reason.

2    Q    Do you know who made the decision?

3    A    I'm not sure who made the decision.  I was

4    informed by Lieutenant Killiany that I was being

5    transferred.

6    Q    Where were you transferred to?

7    A    Back to criminal investigations.

8    Q    So it's more generalized again?

9    A    Yes.

10    Q    When you worked within the narcotics unit,

11    initially Sergeant Peter Barton was your supervisor; is that

12    correct?

13    A    Correct.

14    Q    Did he remain your supervisor throughout the

15    entire time or did that change?

16    A    He did not remain the entire time. That changed.

17    He requested a transfer out of narcotics to investigations.

18    Q    When did he do that or when was the change made?

19    A    I'm not sure exactly, maybe 1999, could have been

20    the end of '98, I'm not sure of the date.

21    Q    Who was your supervisor after Sergeant Barton?

22    A    Sergeant Mullaney.

23    Q    Did he remain your supervisor until July of last

24    year?

25    A    He retired prior to my removal from narcotics.

1      Q      Do you know when he retired?

2      A      I don't recall.  Maybe 2000?

3      Q      Who was your supervisor after Sergeant Mullaney?

4      A      Sergeant Osanitsch.

5      Q      How long was he your supervisor for?

6      A      From the time he took over up until my removal

7    from narcotics.

8      Q      When did you become a member of the Emergency

9    Response Team?

10     A      I don't recall when it was originally formed.

11   Maybe '94 or '95, I'm not sure.  But when it was first

12   formed, I was one of the original members.

13     Q      What did that mean, being a member of the

14   Emergency Response Team, how did that affect your duties?

15     A      The Emergency Response Team was formulated to

16   deal with high risk and serious situations which required a

17   high level of training in order to meet the demands of the

18   situations.

19     Q      Do you know who assigned you to the Emergency

20   Response Team?

21     A      I know there was a decision-making process on the

22   part of the chief, the captain, Chief DiVenere who was a

23   lieutenant at the time, and they ended up picking who they

24   felt would be best.

25     Q      Who was the captain at the time?

1      A      One captain was Captain Ahearn.

2      Q      Let me rephrase, who was the captain who was

3   involved in the decision-making process to put you on the

4   ERT?

5      A      Captain Ahearn.

6      Q      Hern?

7      A      A-h-e-a-r-n.

8      Q      And you said DiVenere was a lieutenant at the

9   time?

10     A      Correct.

11     Q      And he was involved in the process?

12     A      Correct.

13     Q      Was the chief at the time involved in the

14  process?

15     A      I believe so.

16     Q      Who was the chief at the time?

17     A      I believe it was Chief Khonke.  K-h-o-n-k-e, I

18  think.

19     Q      How many people were on the Emergency Response

20  Team when it was first formed?

21     A      I believe there were twelve.

22     Q      Did the assignment involve any change in pay?

23     A      The rate of pay remained the same.  It was

24  overtime for participation in either training or call-out

25  off shift.

1    who had still been there or who had left.

2         I know Chris Lennon had been a member, I know he

3    was off. Rob Mendella had gotten off. New people had come

4    on, so I really can't tell you who was a member at that

5    point in time. I don't remember.

6         Q    Who was in charge of the Emergency Response Team

7    in 1999?

8         A    I believe Captain Kalwat.

9         Q    I know there's this narcotics investigation in

10   August 1999. What two police departments were involved in

11   that investigation?

12        A    Bristol Police Department and the West Hartford

13   Police Department.

14        Q    What were the underlying facts prompting the

15   investigation?

16        A    I believe West Hartford had intercepted a package

17   containing marijuana. They contacted the Bristol Police

18   Department. They wanted to do a joint investigation for

19   controlled delivery of the package to the person to whom it

20   was addressed.

21        Q    Where did the joint investigation take place?

22        A    That occurred in Bristol on Route 6, and I

23   believe it was the Meineke Muffler. I'm not a hundred

24   percent sure, but I believe that was the location.

25        Q    What officers from the Bristol Police Department

1    were present?

2        A    Sergeant Mullaney, Brian Suchinski, Kevin Mellon,

3    Chris Lennon, myself, and I don't recall who else may have

4    been.

5        Q    Do you know the names of anyone from the West

6    Hartford Police Department who was there?

7        A    There was a Detective Kennehan, and then another,

8    I think, detective.  I don't recall his name.

9        Q    Who else was present?

10       A    Police officials?

11       Q    No, everyone?

12       A    At the Meineke shop, the person that we arrested,

13   I don't remember his name, and two other store employees,

14   and there were probably some other officers there, I don't

15   remember who they were.

16       Q    From the Bristol Police Department or West

17   Hartford?

18       A    I don't recall.

19       Q    Okay.  What happened?

20       A    Started the day out with a pre-morning

21   surveillance to gather intelligence, diagram, video.

22       Q    Who was involved in that?

23       A    Detective Lennon and myself.  After obtaining the

24   information that we needed to bring back for a briefing, we

25   came back to the police department, informally discussed the

1      Q    What happened next, you and Lennon are watching

2   from across the street and you observed the delivery?

3      A    We observed and monitored the delivery.  We

4   relayed the information back that the van came, the delivery

5   was made, so on and so forth.  At some point the decision

6   was made for us to enter the premises.

7      Q    Who made that decision?

8      A    I don't recall.

9      Q    Who entered the premises first?

10      A    I don't know.  We all pretty much got there

11   within seconds of each other.  Because of the locations we

12   were parked, we were within maybe a block, block and a half,

13   so we all drove into the parking lot, entered the building

14   and identified ourselves as police.

15      Q    What happened after you entered the building?

16      A    The person who was ultimately arrested was

17   identified to us that he was the recipient of the package,

18   and we immediately, myself, Detective Lennon and myself

19   immediately talked to him and told him what had taken place.

20      Q    I'm sorry, you and who?

21      A    Detective Lennon.  He was the case officer.

22      Q    What happened next?

23      A    Once the situation was explained to the

24   individual, he had told us that he was given money to have

25   these packages mailed to him.  And his instructions were

1   Q    -- the surveillance van, what happened next?

2   A    I'm in the surveillance van for a little while

3   and the door opens up.  It's Detective Lennon.  And he says

4   something along the lines of, You got to help me out, Rick

5   wants to bring this guy in right now.

6        Being in the van, I didn't know what took place

7   and asked him, "What are you talking about?"

8        He goes, "Rick wants to bring this guy in now.

9   We're waiting for this main guy to show up, and Rick wants

10  to bring this guy in now.  You got to go, come over and talk

11  to Rick with me."

12       So I shut the equipment off and get out of the

13  van, and I walked with Chris up to Sergeant Mullaney.

14  Q    Okay.  What happened then?

15  A    I don't recall who spoke first, but we get into

16  the conversation about how the guy we're waiting for isn't

17  showing up and that Sergeant Mullaney wants to bring this

18  person in to arrest him.  And it was either Chris or myself

19  who spoke first, to talk about this, and Sergeant Mullaney

20  asked us why we shouldn't bring him in.

21       Both Detective Lennon and myself at varying

22  instances replied to Sergeant Mullaney, so I can't give you

23  an accurate order of what took place when, but we explained

24  to him that this guy's cooperating and we're waiting for

25  this guy to come.

1    And Sergeant Mullaney again asks us why we

2    shouldn't bring him in.

3    And we tried to answer his question with that

4    he's really a nobody and that there's a chance that we could

5    arrest this other guy, and he repeatedly asked us why we

6    shouldn't bring him in.

7    And he explained to us that if we didn't bring

8    him in, this guy would flee the country, this guy could flee

9    the country. And repeatedly asked us why we shouldn't bring

10   him in.

11   And it just got to the point where Chris and I

12   looked at each other, and we didn't know what Sergeant

13   Mullaney was asking, we just, we didn't know how to answer

14   why we shouldn't bring him in.

15   And after about five or six times of him asking

16   why, he finally, you could tell he was getting upset, he

17   said, "Look, we're bringing him in, and that's the end of

18   it."

19   So Chris and I, you know, I went back to the van,

20   do my thing, and Chris brought him in. Or called for a car

21   to bring him in.

22   Q    While you and Lennon were having this

23   conversation with Sergeant Mullaney, who else was present?

24   A    This occurred in the bay of that business. Most

25   of the people who were involved in this were there. I

1    couldn't tell you who was there.  For this conversation, the

2    three of us were together.  There was nobody else standing

3    with us.  But the rest of the people who were involved or a

4    majority of them were somewhere within the business.

5        Q    Sergeant Mullaney was your superior at the time,

6    correct?

7        A    Correct.

8        Q    How many times do you recall Sergeant Mullaney

9    advising you of his decision to arrest the suspect?

10        A    At least once.

11            The majority of the conversation that we had

12    wasn't him advising that we should arrest him; it was more

13    along the lines of why shouldn't we arrest him?

14        Q    Had Sergeant Mullaney indicated his decision to

15    have the suspect arrested before he asked you why shouldn't

16    you?

17        A    That's what he had told to Detective Lennon who

18    then came to get me out of the van so that I could go with

19    him to discuss this with Sergeant Mullaney.

20        Q    And you don't recall who spoke first when you

21    went back to speak with Sergeant Mullaney?

22        A    No, I don't.

23        Q    Isn't it true that you actually voiced

24    opposition to Sergeant Mullaney's decision after he

25    indicated he wanted the suspect arrested?

1      Q    Sure, what does it provide?

2      A    It states that fighting or quarreling with other

3  employees or a supervisory officer in the public view.

4      Q    And is that considered a violation of the code

5  of conduct?

6      A    Yes, it is.

7      Q    Do you know what the maximum penalty is for a

8  violation of a first offense of Section 2.22?

9      A    It says E, and E is a suspension of up to fifteen

10  work days.

11      Q    For a first offense?

12      A    The way it's written, correct.

13      Q    Were you suspended as a result of a violation of

14  this section?

15      A    No, I was not.

16      Q    Were you suspended at all as a result of the

17  incident during that narcotics investigation?

18      A    No, I was not.

19      Q    What discipline did you receive?

20      A    I received a reprimand which I believe was

21  written, which was followed up with my removal from the

22  Emergency Response Team.

23      Q    Who issued the written reprimand?

24      A    I believe Sergeant Mullaney did in the presence

25  of Sergeant Osanitsch.

1    Q    Did Sergeant Mullaney tell you why he was

2    issuing the written reprimand?

3    A    I don't recall what was said when it was issued.

4    I believe there was some explanation with it; I don't recall

5    exactly what it was.

6    Q    What did the reprimand say; what was the

7    reprimand for?

8    A    I don't recall.

9    Q    Who do you believe made the decision to remove

10    you from the Emergency Response Team?

11    A    I don't know.

12    Q    Do you know who is in charge of the Emergency

13    Response Team?

14    A    Captain Kalwat oversees the Emergency Response

15    Team.  Sergeant Osánitsch was a team leader for the

16    Emergency Response Team.  Ultimately, the chief of police

17    has final say in any decisions which occur.  Who had the

18    final say in this, I don't know.

19    Q    You don't know who had final say?

20    A    No.

21    Q    To your knowledge was Sergeant Mullaney involved

22    in the decision to remove you from the Emergency Response

23    Team?

24    A    I have no idea.

25    Q    To your knowledge was Officer Suchinski involved

1    in the decision to remove you from the Emergency Response

2    Team?

3        A    I don't believe it would be something that would

4    be, he would be in that chain.

5        Q    To your knowledge was Mr. DeKow involved in the

6    decision to remove you from the Emergency Response Team?

7        A    I have no idea.

8        Q    To your knowledge was Chief DiVenere involved in

9    the decision to remove you from the Emergency Response Team?

10       A    It's probable.

11       Q    Based on what?

12       A    Him being the chief and having the final say.  If

13   he felt that it was improper, he would have refused that to

14   take place.

15       Q    Well, that's a different question then whether or

16   not he's the one who decided to remove you from the

17   Emergency Response Team, isn't it?

18       A    I believe so.

19            I do not know who had the say, I do not know who.

20       Q    Okay.  You have no personal knowledge one way or

21   another whether or not Chief DiVenere was involved in that

22   decision?

23       A    Correct.

24       Q    Can you also refer to Section 1.0 of the code of

25   conduct and tell me what is the maximum penalty for first

1      Q    Who did you make that request to?

2      A    As soon as Captain Kalwat explained to me that I

3  was being removed from the SWAT team or the ERT team, I

4  discussed this with him.  I discussed this with the chief

5  when I spoke to him.  No one wanted to know and no one

6  cared.

7      Q    What day did you receive the written reprimand,

8  do you recall?

9      A    I don't recall, but I believe it will be dated,

10  the reprimand itself will be dated when it was issued to me.

11      Q    Do you recall whether or not you received the

12  written reprimand before you were removed from the Emergency

13  Response Team?

14      A    Correct.

15      Q    Do you know how much time passed?

16      A    No, I don't.  I don't remember.

17      Q    Did you complain about the investigation or lack

18  thereof before you learned that you were being removed from

19  the Emergency Response Team?

20      A    I don't think I spoke to anyone in an official

21  capacity complaining about it.  I could be wrong, but I

22  don't think so.

23      Q    Did you grieve or file a grievance regarding the

24  reprimand?

25      A    I'm not sure the exact contents of the grievance,



1   but it may have included both the reprimand and the removal
2   from the ERT team.
3          Q    How many grievances did you file?
4          A    I don't do the filing.  I spoke to one of the
5   union representatives at the time who I believe may have
6   been Kevin Mellon, and he did the filing.
7                MS. VOCCIO:  Mark this.
8                (Defendant's Exhibit 2:    Marked for
9   identification - described in Index.)
10  BY MS. VOCCIO:
11         Q    I'm going to show you what we've just marked as
12  Defendant's Exhibit 2 which is labeled anyway an official
13  grievance form submitted October 5, 1999, and ask you to
14  take a look at that.  Is that the grievance that was filed
15  in your behalf?
16         A    It's the first time I've seen this form.  If this
17  is the official grievance form, then I'll agree with you.
18         Q    Have you seen any other grievance form filed on
19  your behalf?
20         A    Just the copy of a letter that my attorney
21  provided me several weeks ago.
22         Q    What was that letter?
23         A    I believe it was a letter from the state.
24         Q    Do you know what the letter said?
25         A    I don't recall.

1      Q    Do you know who the letter is to?

2      A    It was either to the union or to the city

3    regarding my fourth step in the grievance process.

4      Q    Do you know what the finding was?

5      A    I have no idea.

6      Q    According to Exhibit 2, the grievance states,

7    "That on September 24, 1999, Detective A. Barton was removed

8    from the Emergency Response Team as the result of a written

9    reprimand he received.  The reprimand did not involve

10    Detective Barton's performance as a member of the ERT.

11    Removal is without just cause."

12            Are you aware of any other grievances other than

13    the grievance set forth in Exhibit 2?

14      A    Involving what we're discussing?

15      Q    Correct.

16      A    I'm not aware of any.

17      Q    What is step one with respect to the grievance

18    procedure, do you know?

19      A    Usually it involves the chief of police.

20      Q    Do you know what the next step is if the chief

21    denies it?

22      A    I believe it goes to the personnel department or

23    somewhere in the personnel department.

24      Q    If it's denied at that step, what's the next

25    step?

1        A    I believe it goes to the Board of Police

2    Commissioners.  And then on to the state.

3        Q    Do you know what happened with the grievance that

4    we just marked Defendant's Exhibit 2?  Did it go to step

5    one?

6        A    I believe it did because it immediately went over

7    to the next phase in the process.  I never spoke to the

8    chief on that.  I believe he just denied it outright.

9        Q    Do you believe that it went to the director of

10   personnel as part of step two?

11       A    I'm assuming it did.

12       Q    Do you know if it went to the next step at the

13   Board of Police Commissioners?

14       A    I know it went to the Board of Police

15   Commissioners.

16       Q    You know it did?

17       A    I know it.

18       Q    Do you know what happened at that step?

19       A    I was invited to attend that step.  I was given

20   a memo of when my grievance would be heard, and then prior

21   to the grievance Kevin Mellon instructed me not to go

22   because my grievance wouldn't be heard that day.  And my

23   grievance was heard that day.

24                (Attorney Eric Brown entered the room.)

25

1    A    No.

2    Q    So you're not intimidated in the least bit,

3    correct?  Being here today with my clients here?

4    A    I'm not intimidated.

5    Q    All right.  Good.  Then you're here, you are

6    going to tell the whole truth, right?

7    A    Right.

8    Q    All right.  Now, you became a police officer in

9    1986, correct?

10    A    Correct.

11    Q    And in 1997 you became a narcotics detective,

12    right?

13    A    Correct.

14    Q    What month was that in 1997?

15    A    I was sworn in as a detective in June of 1997.

16    Q    All right.

17    A    And then I was put in the narcotics office maybe

18    August or September.

19    Q    All right.  And at that time your brother was a

20    sergeant in charge of the narcotics office, correct?

21    A    Correct.

22    Q    And Brian Suchinski was working there, correct?

23    When you first joined narcotics, Brian Suchinski was there?

24    Or don't you remember?

25    A    I'm not sure.  Because it was around that time he

STATE OF CONNECTICUT    :

                        ss.

COUNTY OF HARTFORD      :

        I, Nicole M. Gosselin, R.P.R., a Notary Public for the state of Connecticut, do hereby certify that the deposition of ANDREW BARTON, was taken before me pursuant to the Federal Rules of Civil Procedure, at the offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford, Connecticut, commencing at 10:10 a.m., on Thursday, April 10, 2003.

        I further certify that the witness was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as hereinbefore appears.

        I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the event of said cause.

        Dated at Hartford, Connecticut, the 9th day of May, 2003.

                              Nicole M. Gosselin, R.P.R.
                              Notary Public

My Commission Expires December 31, 2006.