BRISTOL POLICE DEPARTMENT          GENERAL ORDER:          95-1-138

DATE OF ISSUE: 09/22/95          EFFECTIVE DATE: 09/22/95

SUBJECT: *CODE of CONDUCT*          RESCINDS: G.O. 6 - 1

ACCREDITATION:          REFERENCE:          DISTRIBUTION:

REVISION DATE: (Effective Date plus 2 years)

## I. PURPOSE:

This General Order updates and revises the Bristol Police Department Code of Conduct.

## II. POLICY:

The Bristol Police Department Code of Conduct contains the rules and regulations which provide for the efficiency, good conduct, and discipline of the Department. The Code of Conduct is a part of the overall policies and procedures of the Bristol Police Department. This revision of the Code of Conduct was approved by the City of Bristol's Board of Police Commissioners at its September 19, 1995, meeting. Upon its approval the Code of Conduct adopted on August 28, 1979, became null and void and the new version of the Code of Conduct went into effect.

All sworn employees are expected to adhere to all departmental policies, procedures, rules, and consequently the Code of Conduct.

## III. DEFINITIONS: n/a

## IV. PROCEDURES:

### A. SHIFT/DIVISION/BUREAU COMMANDERS

(1)   Will instruct their supervisory personnel as to the meaning and intent of the Code of Conduct and answer or obtain answers to their questions.

(2)   Shall periodically evaluate their supervisory personnel as to the supervisors' familiarity, knowledge, and use of the Code of Conduct and procedures for formal disciplinary action.

### B. SUPERVISORY PERSONNEL

(1)   Will familiarize the members of their command with the contents of the Code of Conduct. Answer all questions or obtain answers to those questions that they cannot answer. Inquiries should be directed, in writing, to the Chief of Police. This process allows for standardized responses, as they will affect the entire Department.

### C. SWORN PERSONNEL

(1)   Shall familiarize themselves with the contents of the Code of Conduct. Any questions concerning the contents of the Code of Conduct should be promptly directed, in writing, to their immediate supervisor.

PAGE ONE OF 2 PAGES

BRISTOL POLICE DEPARTMENT
GENERAL ORDER NUMBER:                                    95-1-138
SUBJECT: *CODE of CONDUCT*
EFFECTIVE DATE: 09/25/95                      DISTRIBUTION CODE:

( Continued )

C.  <u>SWORN PERSONNEL</u>

   (2)   Shall maintain a personal copy of the Bristol Police
         Department Code of Conduct.

READ AT ROLLCALL FOR FOUR DAYS

SQUAD/SHIFT/DIVISION/BUREAU COMMANDERS SHALL ENSURE THAT MEMBERS UNDER
THEIR COMMAND ARE THOROUGHLY FAMILIAR WITH, AND UNDERSTAND, THE CONTENTS
OF THIS ORDER.


BY ORDER OF:


William R. Kohnke
Chief of Police

WRK:jel

SUBJECT TO APPROVAL OF THE BOARD OF POLICE COMMISSIONERS:_____

PAGE TWO OF 2 PAGES

BRISTOL POLICE DEPARTMENT

CODE OF CONDUCT

SEPTEMBER 21, 1995

**BRISTOL POLICE DEPARTMENT**

*CODE OF CONDUCT*

PREAMBLE

Sections 45 & 46 of the City Charter, City of Bristol, Connecticut,:

vest the Board of Police Commissioners(the Board) and the Chief of Police(the Chief) with the power to promulgate all rules and regulations concerning the operation of the Bristol Police Department(BPD) and the conduct of all officers and employees thereof;

hold the Chief responsible for the efficiency, discipline, and good conduct of the BPD, and for the care and custody of all property used by the BPD.

The creation of the *Code of Conduct* and the implementation of a uniform disciplinary procedure are hereby established pursuant to the powers vested in the Board and the Chief by the City Charter, City of Bristol, Connecticut. The *Code of Conduct* and the uniform disciplinary procedure established therein are subject to continuing revision.

Sections of the *Code of Conduct* proscribe or prohibit certain specific conduct on the part of employees of the BPD. Violation of any of these sections shall immediately constitute grounds for disciplinary action. The *Code of Conduct*, however, cannot itemize every act or omission which will create sufficient cause for disciplinary action. Acts or omissions not particularly specified in the *Code of Conduct* shall be charged under ARTICLE I, Section 1.00. Because of the broad variety of violations possible under this section, classification of the offense shall be left to the discretion of the employee's Commander, subject to review and final approval by the Chief, or his/her designee.

The *Code of Conduct* and the uniform disciplinary procedure contain a section entitled " EMPLOYEE RIGHTS ". This section is intended to ensure fair, equitable, uniform and judicious treatment of all BPD employees. The uniform disciplinary procedure is intended to apply to superior officers as well as Patrol Officers. Any superior officer or investigator who intentionally violates an employee's rights will be subject to discipline.

For the purpose of determining appropriate penalties for disciplinary infractions the *Code of Conduct* contains the following Offense Class - Penalty rating system:

| Offense Class | Maximum Penalty |
|---|---|
| A | Written Coaching & Counseling |
| B | Written Reprimand |
| C | Suspension, 1 to 2 work days |
| D | Suspension, 3 to 10 work days |
| E | Suspension, 15 work days |
| F | Suspension, 30 work days |
| G | Dismissal |

It should be noted that in all cases listed penalties are maximum penalties for the Offense Class.

In any Class " D " through " G " offense, demotion is a suitable alternative to the listed penalty. In all cases where an employee has committed a previous offense under the same article, the penalty allowable may be increased to the next most severe penalty class. Shift/Division Commanders may recommend penalties for offenses, subject to review by the Chief. An officer suspended by the Chief, or his/her designee , shall have the right to appeal such suspension to the Board. Such an appeal shall be heard by the Board. The Board has the authority to confirm, increase, or reduce the penalty recommended by the Chief, or his/her designee.

BRISTOL POLICE DEPARTMENT

*CODE OF CONDUCT*

## *ARTICLE I*

<u>Sec. 1.00</u>

Officers shall conduct themselves at all times, both on and off duty, in such a manner so as to reflect favorably upon the Department. "Conduct Unbecoming an Officer" shall include any conduct which:

> brings the Police Department into disrepute; or
> reflects discredit upon the officer or the Police Department; or
> impairs the operation, efficiency, or discipline of the Police Department or any officer; or
> adversely effects the morale or efficiency of the Police Department; or
> has a tendency to adversely effect, lower or destroy public respect and confidence in the Police Department or the officer.

## <u>*ARTICLE II*</u>
### <u>*CONDUCT UNBECOMING AN EMPLOYEE*</u>

<u>Sec. 2.01</u>

Accepting a bribe or gratuity for knowingly permitting an illegal act.

| | 1 st. Offense | 2 nd. Offense | 3 rd. Offense |
|---|---|---|---|
| Offense Class | _G_ | _G_ | _G_ |

<u>Sec. 2.02</u>

*Failure to immediately report to a direct supervisor the offer of a bribe or gratuity to permit an illegal act and/or failure to reduce such report to writing within 24 hours.*

| _F_ | _G_ | _G_ |
|---|---|---|

<u>Sec. 2.03</u>

Soliciting or accepting any favor or privilege or other thing of value as a condition for performing official duties.

| _G_ | _G_ | _G_ |
|---|---|---|

<u>Sec. 2.04</u>

Recommending any professional or commercial service for personal gain.

| _F_ | _G_ | _G_ |
|---|---|---|

<u>Sec. 2.05</u>

Knowingly or intentionally abusing official position to obtain any special benefit or favor.

| _E_ | _G_ | _G_ |
|---|---|---|

BRISTOL POLICE DEPARTMENT

*CODE OF CONDUCT*

Sec. 2.06

Failure of any employee to maintain themselves and/or their uniforms in a neat and clean condition.

Sec. 2.07 _A_ _B_ _D_

Removing Department property without proper authorization, but with no intent to permanently deprive the Department of said property.

Sec. 2.08 _B_ _C_ _G_

Removing Department property without proper authorization, with the intent to permanently deprive the Department of said property.

_G_ _G_ _G_

Sec. 2.09

Unauthorized entry into any office, desk, or locker of another, by any means, knowing the employee has no right to access.

_E_ _F_ _G_

Sec. 2.10

Arrest and conviction of a crime.

_G_ _G_ _G_

Sec. 2.11

Knowingly or willfully making a false entry in or knowingly or willfully omitting information from any report or record, written or verbal.

_G_ _G_ _G_

Sec. 2.12

Negligent entry or omission of information from any record.

_D_ _C_ _G_

Sec. 2.13

Using violent, abusive or profane language to a citizen while on duty.

_B_ _D_ _G_

Sec. 2.14

Using violent, abusive or profane language likely to incite another employee, regardless of rank of the employee involved, but not in the presence of others.

_B_ _D_ _F_

Page Two of 11 pages

BRISTOL POLICE DEPARTMENT

*CODE OF CONDUCT*

<u>Sec. 2.15</u>

Using violent, abusive or profane language with the intent to incite another employee, regardless of rank of the employee involved, in public view.

_D_ _E_ _G_

<u>Sec. 2.16</u>

Making public statements or releasing material concerning confidential Department information/matters.

_F_ _G_ _G_

<u>Sec. 2.17</u>

Failure to wear the prescribed uniform for assigned duties.

_B_ _C_ _D_

<u>Sec. 2.18</u>

Smoking in public view, while on walking or traffic assignment.

_A_ _B_ _C_

<u>Sec. 2.19</u>

A member of the Department, except in the discharge of official duties or with permission of the Chief of Police, shall not knowingly associate with criminals, racketeers, or persons engaged in unlawful activities.

_E_ _G_ _G_

<u>Sec. 2.20</u>

Overt disrespect for a supervisory officer.

_C_ _E_ _G_

<u>Sec. 2.21</u>

Use of rude, insulting language or other offensive language by a supervisory officer to an employee of lower rank.

_C_ _E_ _G_

<u>Sec. 2.22</u>

Fighting or quarreling with other employees or a supervisory officer in the public view.

_E_ _E_ _G_

<u>Sec. 2.23</u>

Failing to supply the Police Department with a current telephone number and address.

_B_ _D_ _E_

Page Three of 11 pages

CODE OF CONDUCT

Sec. 2.24

Arbitrary or abusive use of police power or arbitrary or abusive action taken under the color of the police power in personal disputes or affairs.

_G_                          _G_

## ARTICLE III
### CONSUMPTION OF ALCOHOL and/or DRUGS, SICK LEAVE

Sec. 3.01

*Unauthorized* consumption of alcoholic beverages and or drugs while on duty or during the two (2) hours immediately prior to reporting for duty, and/or reporting for duty in an impaired condition.

_F_                    _G_                    _G_

Sec. 3.02

Consumption of alcoholic beverages and/or drugs while off duty and in a readily identifiable Bristol Police Department uniform. "

_D_                    _E_                    _G_

Sec. 3.03

Consumption of alcoholic beverages and/or drugs while off duty, not in uniform, but in possession of a Department issued weapon.

_E_                    _F_                    _G_

Sec. 3.04

Use of any narcotic substance or any controlled drug pursuant to a doctor's order without reporting same to a supervisory officer, where such drug may impair an employee's judgment.

_F_                    _G_                    _G_

Sec. 3.05

Willful failure of an employee to report any, known medical condition which might render the employee unfit for assigned duty.

_F_                    _G_                    _G_

Sec. 3.06

Failure to adhere to Department Sick Leave reporting procedures.

_B_                    _D_                    _G_

Sec. 3.07

Willful or intentional abuse of Sick Leave, Sick Leave reporting procedures, and/or leave related to compensable injuries.

_E_                    _F_                    _G_

Page Four of 11 pages

CODE OF CONDUCT

### ARTICLE IV
### INSUBORDINATION

Sec. 4.01

Refusal to obey lawful orders from a supervisor.

_F_                    _G_                    _G_

Sec. 4.02

A supervisory officer giving an order, knowing such to be unlawful
or beyond the scope of his/her authority.

_F_                    _G_                ·· _G_

Sec. 4.03

A supervisory officer shall not reprimand an employee in a degrading
or defamatory manner ( eg. using racial, ethnic, or sexual slurs,
or an overly loud, demeaning manner, etc.).

_D_                    _E_                    _G_

Sec. 4.04

Reprimands should not be done in public view, except where operations
or exigent circumstances require immediate action.

_B_                    _D_                    _E_

### ARTICLE V
### NEGLECT OF DUTY

Sec. 5.01

Failure to properly supervise subordinates or to prefer disciplinary charges
or to take other appropriate disciplinary action.

_D_          _F_+ Reduction in       _G_
                    Rank

Sec. 5.02

Failure of a supervisor or an investigator to inform an employee of
procedures on Employee Rights under *ARTICLE VIII* of this *CODE OF
CONDUCT* and to adhere to same.

_B_                    _D_                    _G_

Sec. 5.03

Failure to take appropriate action when necessary and/or failure to make
a written report of same to the appropriate Division or Commanding Officer
at the conclusion of the employee's tour of duty, unless specifically waived
by said commander.

_E_                    _F_                    _G_

Page Five of 11 pages

*CODE OF CONDUCT*

Sec. 5.04

Inattentive to duty assignment.

_B_                          _D_                          _G_

Sec. 5.05

Asleep on duty.

_C_                          _E_                          _G_

Sec. 5.06

Absence from duty assignment without authorized permission.

_D_                          _F_                          _G_

Sec. 5.07

Intentional and willful failure to comply with any lawful orders, procedures, directives, regulations, oral or written.

_E_                          _F_                          _G_

Sec. 5.08

Negligent failure to comply with any lawful orders, procedures, directives, regulations, oral or written.

_B_                          _D_                          _G_

Sec. 5.09

Failure to report as a witness when duly notified or subpoenaed.

_B_                          _D_                          _G_

Sec. 5.10

Unauthorized person in a police vehicle.

_B_                          _D_                          _G_

Sec. 5.11

Unauthorized and intentional misuse of a police vehicle for personal use.

_D_                          _F_                          _G_

Sec. 5.12

Refusal to give name and badge number when properly requested.

_B_                          _C_                          _G_

Page Six of 11 pages

CODE OF CONDUCT

**Sec. 5.13**

Failure to be prompt when reporting for duty, including Roll Call, court appearances, and duty assignments.

_B_                         _D_                         _G_

**Sec. 5.14**

No member of the Bristol Police Department shall, without prior written approval of the Chief of Police or his designee, appear or give testimony as a character witness for any defendant in a criminal trial or inquiry in which the Department is involved.

_B_                         _D_                         _G_

**Sec. 5.15**

Willfully damaging Police Department property and/or equipment.

_F_                         _G_                         _G_

**Sec. 5.16**

Willful interference with police radio broadcasting and/or tampering with Department's radio equipment.

_F_                         _G_                         _G_

**Sec. 5.17**

Knowingly failing to report the revocation of one's Motor Vehicle Operator's License to the Department.

_D_                         _F_                         _G_

**Sec. 5.18**

Allowing a prisoner to escape through carelessness or neglect.

_D_                         _F_                         _G_

**Sec. 5.19**

Failure to thoroughly search for, collect, preserve or identify evidence of persons, property, locations in any arrest or investigation.

_D_                         _E_                         _G_

**Sec. 5.20**

Failure to properly patrol assigned zone or beat.

_C_                         _E_                         _G_

Page Seven of 11 pages

CODE OF CONDUCT

Sec. 5.21

Failure to make and/or submit assigned reports in a timely fashion.

_C_                    _E_                    _G_

Sec. 5.22

Failure to answer a radio call within a reasonable period of time.

_C_                    _E_                    _G_

Sec. 5.23

Stolen police vehicle and/or Department property due to failure to lock vehicle when left unattended.

_D_                    _E_                    _G_

Sec. 5.24

Failure to properly care for assigned equipment, vehicle, or any Police Department property, damaging or causing damage to same due to neglect or carelessness.

_D_                    _E_                    _G_

Sec. 5.25

Failure to take appropriate action concerning illegal activity and/or make a written report of an illegal activity committed by a BPD employee.

_F_              _G_                    _G_

Sec. 5.26

Failure to carry out assigned duties or to follow Department orders and procedures efficiently and expeditiously.

_B_                    _C_                    _G_

Sec. 5.27

Performing assigned duties or other official work in a careless or negligent manner or in disregard of prescribed procedures or established practice.

_D_                    _E_                    _G_

Sec. 5.28

Failure to observe Department procedures outlining safety practices or to adhere to established practices relating to safety.

_B_                    _D_                    _G_

Page Eight of 11 pages

CODE OF CONDUCT

Sec. 5.29

Intentionally depriving a prisoner or suspect of basic rights or
humane treatment.

_F_                        _G_                              _G_

ARTICLE VI
GUIDELINES RELATING TO THE USE OF FORCE AND FIREARMS DISCHARGE

Sec. 6.01

Intentional, unnecessary and excessive use of force in effecting an
arrest or in the performance and execution of other official duties.

_G_                        _G_                              _G_

Sec. 6.02

Deviation from DEPARTMENT FIREARMS GUIDELINES.

_G_                        _G_                              _G_

ARTICLE VII
AUTHORIZED EQUIPMENT

Sec. 7.01

While on duty, BPD personnel will only carry and use equipment
authorized for use by the Department.

_B_                    _D_                              _G_

Sec. 7.02

Employees may only use those items or types of equipment with which
they have displayed required proficiency and have Department authorization.

_C_                        _E_                              _G_

ARTICLE VIII
DEPARTMENT INVESTIGATIONS

Sec. 8.01 AUTHORITY TO CONDUCT INVESTIGATIONS
The Code of Conduct establishes the Department's right and
responsibility to conduct investigations into questions
arising out of an employee's conduct.


Sec. 8.02 TYPES of INVESTIGATIONS
There shall be two types of Departmental investigations:
        Informal Investigations; and/or
        Formal Investigations.

Page Nine of 11 pages

*CODE OF CONDUCT*

## Sec. 8.03 INFORMAL INVESTIGATIONS

An investigation whose possible disciplinary impact upon an employee may be as severe as up to a two day Suspension. If, during the course of an Informal Investigation, it becomes apparent that the investigation may lead to more stringent administrative penalties or criminal charges the investigation will be upgraded to a Formal Investigation.

## Sec. 8.04 FORMAL INVESTIGATIONS

An investigation whose possible disciplinary impact upon an employee may result in a suspension in excess of two days, termination, or referral for criminal investigation.

### ARTICLE IX
### DEPARTMENT DISCIPLINARY PROCEDURES

## Sec. 9.01 NOTICE TO BE GIVEN

All disciplinary proceedings shall be preceded by notice to the employee concerning the conduct which is alleged to comprise the violation.

## Sec. 9.02 ORAL NOTICE

In disciplinary proceedings which may result in a Written Reprimand or Written Counseling & Coaching the notice may be given to the employee at the outset of the proceeding at which the action is to be taken. A reasonable delay will granted to allow the employee time to prepare a defense, if the employee so requests.

## Sec. 9.03 WRITTEN NOTICE

In all disciplinary proceedings which may result in disciplinary action greater than a Written Reprimand, notice will be given to the employee in writing. Such Written Notice to the employee will be carried out at least five business days prior to the date of a scheduled hearing, in order to afford the employee the opportunity to prepare a defense.

## Sec. 9.04 REQUESTS TO HAVE WRITTEN COACHING & COUNSELING DECLARED
### NO LONGER ADMISSIBLE OR RELEVANT

Employees who have been issued Written Coaching & Counseling and who have not committed a similar offense for a period of 12 months shall have the right to petition the Chief of Police to have such Written Coaching & Counseling declared," No Longer Admissible or Relevant". Upon the decision of the Chief of Chief to grant such a request the subject Written Coaching & Counseling shall not be used or considered in any future Department disciplinary proceeding.

## Sec. 9.05 REQUESTS TO HAVE WRITTEN REPRIMAND DECLARED NO LONGER
### ADMISSIBLE OR RELEVANT

Employees who have been issued a Written Reprimand and who have not committed a similar offense for a period of 24 months shall have the right to petition the Chief of Police to have the Written Reprimand declared," No Longer Admissible or Relevant". Upon the decision of the Chief of Police to grant such a request the Written Reprimand shall not be used or considered in any future Department disciplinary proceeding.

CODE OF CONDUCT

### ARTICLE X
### EMPLOYEE'S RIGHTS

Sec. 10.00 EMPLOYEES INTERVIEWED WITH RESPECT TO A DEPARTMENT FORMAL INVESTIGATION SHALL:

Ss 10.00.01 be entitled to know the specific incident which is being investigated, and if particular allegations have been made, the nature of the allegations;

Ss 10.00.02 be warned of their " GARRITY RIGHTS ";

Ss 10.00.03 have the right to be represented by a Union Representative;

Ss 10.00.04 have the right to a reasonable delay(a maximum of five business days) of the interview, for the purpose of obtaining and reviewing their prior reports, if any, concerning the incident;

Ss 10.00.05 be required to answer all reasonable questions and/or complete written reports concerning the performance of their duty and/or activities reasonably considered to affect their ability to carry out their duties and responsibilities;

Ss 10.00.06 not be required to submit to a polygraph examination.

### ARTICLE XI
### POWER TO SUSPEND and/or RELIEVE FROM DUTY

Sec. 11.01 POLICE CHIEF'S POWER OF SUSPENSION

The Chief of Police, or his designee, shall have the right to suspend and/or relieve from duty any member of the Police Force for violation of any of the above rules. Such suspension shall not exceed two calender weeks. An officer suspended by the Chief of Police, or his designee, shall have the right to appeal such suspension to the Board of Police Commissioners. Such appeal shall be heard by the Board of Police Commissioners. At the direction of the Board of Police Commissioners the Chief of Police shall present all evidence pertaining to the incident(s) that resulted in the suspension.

Sec. 11.02 POWER TO RELIEVE FROM DUTY

The Chief of Police, his/her designee, and/or the highest ranking officer on duty shall have the authority to temporarily relieve an officer from duty for just cause (eg. an alleged serious violation of Departmental rules and/or criminal offense). Such action shall immediately be reported to the Chief of Police, or his/her designee, for such actions as he/she may deem necessary.

Page Eleven of 11 pages

BRISTOL POLICE DEPARTMENT

DAY__Friday_____  DATE__09-03-99__ TIME _____

TO:__Det Lt Killiany_____

FROM:__Det Sgt Mullaney_____

SUBJECT:__Det A Barton_____ RE:Meineke Muffler Incident___

On 08-31-99, Bristol Police detectives and West Hartford Police detectives set up a joint operation to conduct a controlled delivery of an intercepted shipment of marijuana that was sent Airborne Express to Meineke Muffler, located at 1114 Farmington Avenue in Bristol (RE: Incident Number 990831-031). During the operation, the delivery of marijuana was accepted and signed for by a Meineke Muffler employee, after which police converged on the business and proceeded with a follow up investigation. During this time, probable cause was developed which resulted in the arrest of the employee.

Just prior to placing the employee under arrest, I was in the bay/garage area of the business and was standing next to West Hartford Det Sgt Carl Rosenweig and Det Bill Kinahan. Also standing nearby was Bristol Det Brian Suchinski, as well as two Meineke employees. We were at a point where we were wrapping up the operation at the muffler shop when Det. Chris Lennon (case officer) approached and stated he wished to arrest the suspect by means of a warrant instead of doing so on scene. I began to discuss this with Lennon, stating I preferred to have the employee placed under arrest at this time. While talking to Lennon, Det. Andrew Barton approached our location and interrupted the discussion. He stated "we're going to arrest him with a warrant and not now" (or similar comment). I told Barton that we were going to go with an on scene arrest because of the probable cause at hand. Det Lennon had stated he would rather use a warrant, however complied when I told him what my preference was and ended the discussion after a brief period of time. Det. Barton continued to express his desire to obtain a warrant and I again told him the employee would be arrested on scene. He then walked away from my presence for a brief period of time, leaving me with the two West Hartford detectives. Det. Suchinski also observed this conversation. Meineke employees William Burke and Guillermo Castillo were also within earshot.

I then became involved in other activities in the garage area for a couple of minutes, after which I stood in the center of the bay area near the two West Hartford detectives, conversing with them. Dets.Lennon, Barton and Suchinski were all standing within close proximity to me and Castillo and Burke were in the bay area. Also standing nearby was the suspect employee, Javier Rivera. I spoke to Lennon about putting Rivera into custody at the scene. At this point, Det. Barton again engaged me in a conversation about using a warrant. He also appeared to be upset over the on scene arrest. I told Barton that the suspect would be arrested at the present time and he replied that this was not necessary,that we didn't have to effect an arrest now. I again told him that I decided that the person would be arrested at this time. I asked Barton what we would gain by using a warrant and he offered a vague answer and said we could tie up loose ends. I told him I didn't want to risk the suspect fleeing because of the magnitude of the incident and he would be arrested on scene. Barton continued to debate the on scene arrest, at one point attempting to offer an explanation of some sort about what the next steps of the investigation should be and why we should hold off on the arrest. I told him again that we would arrest the person on scene. During Barton's disputing of the arrest, he gradually became increasingly insistent about his opinion on the matter.

Page-2            Det. A Barton         RE: Meineke Muffler

Barton continued to remain upset, to the point where he was vigorously disputing my decision on the arrest. Det Barton did not actually disobey instructions, because I had told Lennon to place the suspect into custody, however he hotly disputed the decision regarding the arrest and continued to do so, at which point I firmly told him that the suspect would be arrested at this time, that it was not open to debate and that this was the end of the discussion. Barton walked away at this point.

As mentioned, several people were present during this time. One of the West Hartford detectives mentioned above showed a reaction to Barton's conduct by means of a facial expression after Barton walked away. They had been watching Barton during the conversation. Det. Suchinski observed the incident and Det. Lennon was nearby within earshot. Three Meineke employees were present, including the suspect. During the incident, Barton showed poor control of himself, allowing himself to become upset and dispute my decision in view of numerous other people mentioned above. I had told him approximately four to six times (between two different discussions) the suspect would be arrested at this time and eventually I had to firmly tell him the conversation was over because he continued to try and argue the point. Each time I told him of my decision, Det Barton would continue to dispute the decision in an arrogant and argumentative manner which eventually caused a scene in front of people.

Since the incident described above, Det. Barton again showed a tendency to dispute a decision made by me. On Thursday, 09-02-99, NET and ERT were planning to serve two search warrants on Davis Drive. I informed Det. Lennon who I was going to use as the case officers on the two different warrant executions and also told him my reason for the decision. Det Barton was sitting nearby and he did not agree with what I had told Lennon. Det. Barton then stated to me, "you know, ordinarily we use the affiant on the warrant as the case officer--That's usually how we do the warrants" (similar). I told Barton I had a reason for the decision. He continued to dispute the decision by stating " well, that's not really very logical to use someone else". I again told him that the decision was made and was final.

As a result of Det. Barton's conduct, and in view of the fact that the incident at Meineke occurred in view of other police employees and business employees, the incident came to an embarrassing conclusion when I had to become firm with Barton. This seemed to have an adverse effect on what was a cooperative operation between members of two police department by disrupting the operation and creating an embarrassing conclusion to our efforts. This conduct also reflected unfavorably upon the Department in view of the other people present.

As a result of Det. Barton's conduct, he has violated two sections of the Bristol Police Department Code of Conduct as follows:

1) Sec. 2.22--Quarreling With Other Employees Or A Supervisory Officer In The Public View.
2) Sec. 1.00  Conduct Unbecoming An Officer

Submitted By
Det Sgt R Mullaney

## BRISTOL POLICE DEPARTMENT

September 10th, 1999

TO:      Chief J. DiVenere

FROM:    Lt. T.Killiany                                                                    ℗

SUBJECT:    Detective Andrew Barton

On Wednesday, September 1, 1999 Detective Sergeant Richard Mullaney approached me with a situation that arose on Tuesday, August 31, 1999 during a joint narcotics investigation with the West Hartford Police. This situation involved the conduct of Detective Andrew Barton. I directed Sergeant Mullaney to document the incident and submit his report to me for review.

Attached you will find Sergeant Mullaney's documentation of the incident at the Meineke Muffler Shop during the course of a drug investigation and narcotics arrest.

I have reviewed this report and spoken with Sergeant Mullaney concerning the incident and his report. Det. Barton's behavior was totally inappropriate and bordered on insubordination.

Sergeant Mullaney explains that he was approached by the case officer, Det. Lennon, and a discussion took place concerning the arrest. Sergeant Mullaney discussed the arrest with Lennon and Lennon followed Mullaney's instructions. Det. Barton interrupted the discussion to provide his opinion on how the case should be handled. Sergeant Mullaney listened to Barton and evaluated his opinion along with all the circumstances. Sergeant Mullaney instructed Lennon and Barton that the arrest would take place as decided previously. Barton continued to argue with Mullaney in full view of civilians and officers from another department. Not until Mullaney became very assertive, did Barton stop arguing.

This type of conduct can not be tolerated between a supervisor and a subordinate, especially in public view and in the presence of officers from another police department. I believe Det. Barton was disrespectful to his supervisor in public view and crossed the line between offering his opinion and arguing with his supervisor.

I agree with Sergeant Mullaney's assessment of the situation, that Det. Barton violated two sections of the Bristol Police Department Code of Conduct. At the very least, Det. Barton should be issued a written reprimand for violations of Sections 1.00 -- Conduct Unbecoming an Officer and 2.22 -- Quarreling With Other Employees or a Supervisory Officer in the Public View.

I agree w/ Killiany + Mullaney ████████████

~ I ████████████████████

DwL

I concur.
Issue as suggested.    9/13/99
        9/13/99

#4 99-26

## EMPLOYEE REPRIMAND REPORT

Name __Andrew Barton__

Date __9/4/99__ Time ____ Oral ____ Written __XXXXX__ Suspension ____ Discharge ____

Classification __Detective__ Department __Police__

Remarks __Article I, Sec. 1.00 Conduct Unbecoming an Employee__
__Article II, Sec. 2.22 Quarreling With Other Employees or a Supervisory Officer in__
__Public View.__

Ref: Incident 990831031 Narcotics arrest 1114 Farmington Ave. Bristol

Det. Sgt. Mullaney's report dated September 3, 1999.

*(Remarks must be accurate and concise)*

Witness __S. Barton__

Dept. Head/Supervisor __Sgt. R. Mullaney__
(Please Print) __Sgt. R. Mullaney 9/4/99__

PERSONNEL DEPARTMENT COPY

## BRISTOL POLICE DEPARTMENT

DAY <u>Wednesday</u>    DATE <u>09-15-99</u>    TIME _____

TO: <u>Det. Lt. Killiany</u>

FROM: <u>Det. Sgt. Mullaney</u>

SUBJECT: <u>Discipline    RE: Det. A. Barton</u>

Sir;

On 09-14-99, I issued Det. A. Barton a written reprimand regarding the incident at Meineke Muffler that I previously reported to you. The reprimand was for violations for Code of Conduct Article I, Section 1.00 and also Article II, Section 2.22.

In addition, I have spoken to Det. Barton regarding his responsibilities while at work. It was explained to him that input from employees is acceptable and encouraged during the course of an investigation. He was informed that his level of input rose to the point where he engaged in arguing his point and caused a scene. He was further advised that once a decision is made by any supervisor, that it is his responsibility to comply with the decision at that time.

Sgt. E. Osanitsch witnessed the issuance of the reprimand and the above discussion with Det. Barton.

BRISTOL POLICE DEPARTMENT

DAY  - Friday  DATE  10-01-99  TIME_____

TO:_        Det. R. Mendella

FROM:_      Det. A.J. Barton

SUBJECT:_   Greivence

On or about Friday, 09-24-99, Capt. Kalwat called me into his office, and informed me he was removing me from the ERT Team. I would like to Grieve this.

Respectfully

Det. A.J. Barton

BRISTOL POLICE DEPARTMENT
**INCIDENT REPORT**

INCIDENT # 99083101

☐ SUPPLEMENT

| Date of Incident | Date of Incident | Time | Type of Incident |
|---|---|---|---|
| 08/31/99 | | 1331 | Narcotics Arrest |

| Incident Code | Officer / | |
| | Lennon | |

| Incident | Street No. | Street Name | | City | State | Apartment No. |
| Location | 1114 | Farmington Av. Meineke Muffler | | | | |

Status Codes: O=Complainant I=Interviewed A=Advising P=Parent S=Suspect V=Victim W=Witness O=Other

| Status | Last Name | First Name | M.I. | Sex | Race | MoDay Yr | Age | Telephone | Address | | Pey., Op. or S.S. |
|---|---|---|---|---|---|---|---|---|---|---|
| O | Burke | William | J | M | W | 04/22/49 | 50 | | 32 Martin Rd. Bristol, CL | |
| O | Castillo | Guillermo | | M | H | 12/23/70 | 18 | 585-8396 | 80 Washington St. Apt. B-2 Bristol, CL | 04196354 |

| A=Arrested | | | | | | | | | | |

| Status | Last Name | First Name | M.I. | Sex | Race | MoDay Yr | Age | Telephone | Address | | Pey., Op. or S.S. |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Rivera | Javier | | M | H | 05/23/66 | 33 | 583-9478 | 94 Putnam St. Bristol, CL | 176750076 |

| A=Arrested | | | | | | | | | | |

| Charge 1 | Statute | Charge 2 | Statute | Charge 3 | Statute | Charge 4 | Statute |
|---|---|---|---|---|---|---|---|
| Poss more than Kilo Mari | 21a-278(b | Poss. Marijuana | 21a-278(c | | | | |

| Charge 1 | Statute | Charge 2 | Statute | Charge 3 | Statute | Charge 4 | Statute |
|---|---|---|---|---|---|---|---|

| Charge 1 | Statute | Charge 2 | Statute | Charge 3 | Statute | Charge 4 | Statute |
|---|---|---|---|---|---|---|---|

Status Code: A=Abandoned E=Evidence F=Found L=Lost O=Other R=Recovered S=Stolen T=Towed V=Vehicle

| Code | Qty | Year | Item | Brand / Model | Vehicle Registration | Color | Character/Actual Conditions /Serial/VIN |
|---|---|---|---|---|---|---|---|
| E | | | See attached Supplement | | | | |

Off. Signature _____ Sworn and subscribed before me, this ___ 1st ___ day of ___ Sept ___ 1999.

Reviewed By _____

On 08/30/99 I received a phone call from Det. William Kinahan of the West Hartford, Ct. Police Dept. Det. Kinahan told me that the West Hartford Police Dept. had information concerning a shipment of drugs that was supposed to be delivered to an address in Bristol. Det. Kinahan related the following information. On Friday 08/27/99 at approx. 0930hrs Det. Paul Melanson of the West Hartford Police Dept. received a phone call from John Faulise of Airborne Express Delivery Service located at 141 South St. in West Hartford, to alert the West Hartford Police to Airborne Express' receipt of a suspicious 52 pound package. The package had been sent from "Yellow Toyota" located at 7 Silverado Lane in Los Angeles, Ca. with a return phone number of either 518-862-1861 or 518-862-4864. The package was to be sent to John Periony of 1114 Farmington Av. Bristol, Ct. with a phone number of 860-584-9551. The account was new to Airborne Express so employees checked and found that the phone numbers of the sender were not legitimate. They became concerned that the shipment may be narcotics related so they notified the police.

West Hartford Detectives attempted to verify the information on both the sender and the reciever of the package. It was found that the address and the business for a "Yellow Toyota" did not exist in the Greater Los Angeles area. Also that the area code for the return phone number (518) is for Schenectady, NY. One of the Phone numbers was found to be out of service and there was no answer at the other one. There is no "Yellow Toyota" listed in Schenectady, NY. to correspond to the area code.

Det. Melanson made a call to the number of the reciever, John Periony. The number was found to belong to Meineke Muffler at 1114 Farmington Ave. in Bristol, Ct. Det Melanson was told by Meineke Muffler personnel that there was no one there by the name of John Periony.

West Hartford Detectives then went to the Airborne Express office along with West Hartford Police Officer David Dubeil and his K-9 partner, Luke. Luke has been trained in narcotic detection. At 1140hrs Luke was presented with several boxes, including the suspect package. Luke alerted to the suspect package, indicating the probable presence of illegal drugs. West Hartford Detectives retained the suspect package and brought it to the Special Investigations division of the West Hartford Police Dept. pending a search warrant. See attached copy of report by Officer Dubeil.

West Hartford Police sought and obtained a search warrant for the suspect package. See attached copy of West Hartford's search warrant and return of same. West Hartford Police examined the suspect package, a "Contico" ventilated storage shelf box bearing Airborne Express airbill number 6137288054 with the above listed "to" and "from" addresses. The box contained a Sterilite 48 qt. plastic container which contained five individually wrapped packages containing suspected marijuana. The weight of the 5 packages, including wrapping, is approx. 31.5 lbs.. The suspected marijuana was weighed and field tested by West Hartford Detectives. It field tested positive for marijuana. Det. Kinahan said that on Monday 08/30/99 Airborne Express received a phone call from a male with a Jamaican accent claiming to be a John Perry and wanting to know where his package that was to be delivered to 1114 Farmington Av. in Bristol, Ct. was.

Detectives from both Bristol and West Hartford collaborated in a joint investigation where it was decided that a controlled delivery of the package would be attempted. West Hartford Detectives removed four of the five wrapped packages of suspected marijuana from the "Contico" box. A single wrapped 6 pound package of suspected marijuana was left in the "Contico" box. The empty space in the box was then filled with newspapers and weights so that the box would be close to its original weight. The other four wrapped packages were removed from the box and remained at the West Hartford Police Dept. for security, in case something went wrong during the controlled delivery and the box was lost, only a small quantity of marijuana would be out on the streets. The "Contico" box was then resealed to appear as if it had not been opened.

| Signature | | Pit. Shift. Comm. | |
|---|---|---|---|
| | 0103 | | |
| Viewed By Sgt. | | ID. NO. | |

Sworn And subscribed before me, this 1st day of Sept 1999
Sgt A Mullany    Sgt of Police

990831031

On 08/31/99 Lt. Carl Rosenweig, Det. Paul Melanson, Det. William kinahan, and Det. Randy Law, all of West Hartford Police Dept. responded to the Bristol police Dept. They had in their possession the resealed "Contico" box containing the single 6 pound wrapped package of suspected marijuana. They had also borrowed an Airborne Express delivery van and uniform.

At approx. 1155hrs on 08/31/99 Det. Paul Melanson drove the Airborne Express delivery van into the parking lot of Meineke Muffler located at 1114 Farmington Av. Bristol, Ct.He was wearing the borrowed Airborn Express uniform, posing as the delivery van driver. Det. Melanson had the resealed "Contico" box containing the single 6 pound package of marijuana in the van. As Det. Melanson was exiting the vehicle, a male, later identified as Rivera, exited Meineke Muffler and approached Det. Melanson. Det. Melanson was wearing a hidden body microphone that was being monitored by Lt. Rosenweig, Det. Kinahan, Det. Suchinski, Det. A. Barton, and myself. Det. Barton was also videotaping the transaction from a hidden location.

When Rivera approached Det. Melanson, Det. Melanson told him that he had a package for John Perry. Rivera said "Yeah." Det. Melanson asked Rivera "Are you John Perry?" Rivera said "Yes." Det. Melanson had a clipboard and appropriate paperwork for Airborne Express when a delivery is made. Det. Melanson then told Rivera to sign the form and to print his first initial and last name in an adjacent box. Rivera signed "J. Perry" and printed "John Perry". Det. Melanson then used a hand truck to bring the 'Contico" box inside of Meineke Muffler and left it in front of the counter. Det. Melanson then drove away. As he drove away Det. Law entered the store pretending to be a customer, so that the package could be observed. Det. Law spent a short time in the store engaging Rivera in conversation. Rivera did not go near the package. Det. Law then exited the store. The bays to the garage were open and it appeared that there were no customers in the store at this time. Detectives from both departments moved in and secured the building. There were three employees inside, Rivera, Burke, and Castillo. All three were initially handcuffed and separated for the safety of all parties involved. The scene was determined to be safe and all three parties were then uncuffed.

Based on the physical description provided by Det. Melanson, Det. Law, and Det. Barton, Rivera was singled out and separated from the other two employees. Rivera was told the reason for our presence. Rivera said that the other two employees had nothing to do with what was going on and knew nothing about the package. Rivera then said that he was just accepting the package for an acquaintance named 'Eddie". Rivera said that he had already paged "Eddie" to let him know that the package had arrived. Rivera said that he was willing to cooperate with police to see if "Eddie" would come down and get the package from him.

"Eddie" did not return Rivera's page. Rivera said that he was going to try again and paged "Eddie" two more times. "Eddie" did not return any of Rivera's pages. At this time Rivera was placed under arrest and handcuffed. Rivera asked me if he could call his wife. I dialed the phone and held it to his ear for him. Rivera told his wife that he was being taken away because he had had some marijuana delivered to him. No one told Rivera what was in the "Contico" box, and all police personnel on scene were careful not to mention what the box contained. Rivera had not opened the box, but knew what the contents were.

Rivera was transported to the Bristol Police Dept. The "Contico" box and 6 pounds of suspected marijuana were taken to the Bristol Police Dept. and placed into evidence. Rivera was processed through booking and Charged on UAR # 1114324 with Possession of More that One Kilo of Marijuana With Intent To Sell 21a-278(b) and Possession of Marijuana 21a-279(c). He was held on a $100,000. bond. During the entire incident Rivera was very cooperative. He was polite and did not give police a hard time.

| rt Signature | | Pit. SNR Comm. |
|---|---|---|
| viewed By Sgt. | OIC | D. NO. |

Sworn and subscribed before me, this 1st day of Sept 1999

990831031

Rivera said that he was willing to cooperate with police and was willing to give a statement. Rivera had been notified of his Constitutional Rights during the booking process. I again notified Rivera of his Constitutional Rights. Rivera signed a waiver of those rights and gave me a written statement.

Rivera's statement said, in part and among other things, that about 3 to 4 months ago a male that Rivera knows only as "Eddie" came to Meineke. The two got to know each other. A few weeks after meeting, "Eddie" asked Rivera if he would like to make some money on the side. "Eddie" explained that he would have a package delivered to Meineke. Rivera would sign for the package and then give it to "Eddie". Rivera would not have to know what was in the package and "Eddie" would pay him $1,000. Rivera would not know what name would be on the package or when one was coming. He would just sign for whatever name was on the package. Rivera had signed for packages for "Eddie" approx. 3 times, and was paid $1,000. for each. "Eddie" was always right there after the package was delivered to get it and old Rivera that he followed the Airborne Express vans from when they left the Airborne Express garage. Rivera said that he never asked "Eddie" what was in the packages but that he knew it was drugs by the way that "Eddie" was doing things.

On Thursday 08/26/99 "Eddie" called Rivera to tell him that a package would be coming in of Friday. The package did not come so Rivera paged "Eddie" to tell him. "Eddie" said that he was going to call Airborne Express to find out where the package was. Someone then called Rivera asking for John Perry. Rivera did not know that that would be the name on the package at that time so he told the caller that here was no one there by that name. The caller was actually Det. Melanson. "Eddie" then called Rivera pack and told him that the name on the package was John Perry and if Airborne Express called to ask about the name, to confirm it.

On Monday the package did not show up. Rivera paged "Eddie" again and told him about the package. "Eddie" called Airborne Express and then called Rivera back to tell him that they had probably lost the package but to keep an eye out for it anyway. When the Airborne Express van pulled into the parking lot today, Rivera figured that the package was there. He went out to the van and when the driver asked if he was John Perry, Rivera said that he was and then signed for the package. Rivera said this was the biggest package he had received. He paged "Eddie" to let him know that the package had arrived. "Eddie" did not return his page.

The next thing was that the police came in and told Rivera what was going on with the package. Rivera old the police that he would cooperate and try to get "Eddie" to come get the package. Rivera tried paging "Eddie" several more time but he did not return the pages. Rivera was then arrested and handcuffed. He asked the police if he could call his wife. He told his wife that he was being taken in because he had some marijuana delivered to him.

Rivera said that the reason he did this was to provide for his wife and two year old son because he was having trouble keeping up with the bills. See attached waiver of Rights and statement by Rivera.

Det. Sgt. Mullaney went to the West Hartford Police Dept. with Det. Mendella to get the remaining four packages of suspected marijuana. The remaining four packages were transported to the Bristol Police Dept. and the entire amount was secured in the Bristol Police Dept. evidence vault.

The single 6 pound package of marijuana that was delivered to Rivera was field tested at Meineke Prior to Rivera being placed under arrest. The test was positive for the presence of Marijuana.

The investigation is continuing.

## Evidence Taken

1-cardboard box (Contico plastic storage shelving)
1- 48 qt. plastic storage bin
5-plastic wrapped bundles each containing marijuana
   Package #1-approx. 6lbs
   package #2-approx. 7lbs
   package #3-approx. 9.5lbs
   package #4- approx. 3lbs
   package #5-approx. 6lbs
         Total weight approx. 31.5lbs

1-videotape of delivery to Rivera
1-packing slip receipt, that had been removed from "Contico" box after delivery and was found in
  Rivera's pocket following his arrest
1-Airborne Express "Cartage Record" signed by Rivera in the name of John Perry
12-Polaroid photos taken by West Hartford Police of "Contico" box when they served their search
  warrant
1-Polaroid photo of single 6 lb bag of marijuana that was delivered to Rivera in "Contico" box

The above information is true and correct to the best of my knowledge.

           Signed _Det. C. _____ #0103

Signed and subscribed to before me on this _1st_ day of _Sept_ , 19 _99_

           Signed _Det Sgt R Mullaney_

           _Sgt_ of Police

BRISTOL POLICE DEPARTMENT                    GENERAL ORDER:

DATE OF ISSUE:     AUGUST 16, 1995     EFFECTIVE DATE: AUG. 16, 1995

SUBJECT:  EMERGENCY RESPONSE TEAM     RESCINDS:

ACCREDITATION:                          DISTRIBUTION:

**PURPOSE:**  This order establishes guidelines for the Emergency Response Team. These guidelines will include selection of Team members and training considerations as well as the establishment of procedures for its activation and use.

**POLICY:**  The Department recognizes the need to have a team of highly trained and specially equipped officers to respond to high risk situations. The main objectives of these officers are the protection of the citizens of Bristol, the police personnel involved, and the subject(s) themselves.

**DEFINITIONS:**

A. EMERGENCY RESPONSE TEAM   (ERT)

An inter-divisional unit comprised of a selected group of officers who have been trained and equipped to respond to high risk situations. Personnel assigned to the Team assume the duty as a secondary assignment to their regular duties.

B. HIGH RISK SITUATION

Incidents involving an act of violence or potential violence in which police officers are at a disadvantage and subject to extreme danger, which includes, but is not limited to; high risk arrest and search warrants, hostage situations, barricaded subjects, sniper situations, crowd control, witness/dignitary protection.

**PROCEDURE:**

A. EMERGENCY RESPONSE TEAM ACTIVATION AND CALL-UP:

1. A command officer with the rank of Captain or Chief of Police is authorized to activate the ERT for an existing or potential high risk situation.

2. EMERGENCY ACTIVATION:

A Staff officer gaining authorization shall notify the ERT Commander, or in his absence the ERT Team Leader(s), who will then proceed with the notification of the team members.

3. NON-EMERGENCY ACTIVATION:

As in the case of a preplanned activity or developing

PAGE 1 OF 4 PAGES

BRISTOL POLICE DEPARTMENT                    GENERAL ORDER:    95-1-134

SUBJECT: EMERGENCY RESPONSE TEAM    EFFECTIVE DATE: AUG. 16, 1995

situation, the officer in charge shall notify the
Chief of Police of the situation. The Chief shall
determine the need to activate the ERT.

4. ACTIVATION GUIDELINES:

In any case, when any member of the ERT is activated in
their capacity as a member of the Team, the entire
Team will be utilized. This is required due to the
methods, training, and equipment of the Team.

## B. PATROL RESPONSE:

Patrol units, upon determining that a high risk
situation exists, should immediately contain
the scene and notify Communications of the situation.

The Patrol Sergeant shall respond to the scene,
evaluate the incident and determine if a high risk
situation exists. If the situation exists, the
Shift Commander shall be notified.

The Shift Commander shall notify the Operations
Commander pursuant to A.1 of this procedure.

## C. ERT MEMBER ACTIVATION AND CALL-UP PROCEDURES:

ERT members are not considered to be "on-call".

If called to respond to a high risk situation or
preplanned activity, and if available, they will
respond as directed by the Team Commander.

Once upon the scene, ERT Commander, or Team Leader,
shall advise the Chief of Police, or his designee, of
the situation and the available options to conclude it.
The Chief, or his designee, shall determine the extent of
the Teams response based upon the safety of all concerned
parties.

## D. ERT MEMBER SELECTION PROCESS:

1. When an position becomes available on the ERT
   the following procedure will be enacted:

   a). The opening will be posted in a place visible to
       all officers and will state the closing date for
       responses,
   b). The names of officers responding to the
       announcement will be forwarded to all Lieutenants
       and Captains for review and recommendations based
       on the following criteria;

| BRISTOL POLICE DEPARTMENT | GENERAL ORDER: | 95-1-134 |
|---|---|---|
| SUBJECT: EMERGENCY RESPONSE TEAM | EFFECTIVE DATE: | AUG. 16, 1995 |

     1). A minimum of two years of full-time police
        experience, —

     2). The ability to conduct themselves calmly and
        effectively in stressful conditions,

     3). A low incidence of sick leave and a low
        incidence of sustained personnel complaints,

     4). Previous military experience,

     5). Initiative, job interest and dedication to the
        police profession,

     6). A personal commitment to training,

     7). A handgun qualification score of 95% or better
        at the previous qualification session,

     8). Voluntary application for team membership when
        posted,

     9). Physical fitness.

  c). A committee consisting of the Chief of Police,
     Captains, Det. Lieutenant, a Patrol Lieutenant,
     ERT Commander, Training Lieutenant and a Union
     representative will meet to review the names and
     recommendations and will select the officer(s) to
     fill the opening(s).

## ERT MEMBER REMOVAL PROCESS:

A member of the ERT can be removed from the Team based
upon any of the following criteria:

  1. Demonstrated and consistent unavailability for
    training sessions or actual call-outs,

  2. A below 95% handgun qualification score at the
    previous qualification session,

  3. A serious, sustained, violation of the BPD Code of
    Conduct as determined by the Chief of Police and
    ERT Commander,

  4. Demonstrated lack of physical fitness,

  5. Team members, by majority vote, may petition the
    Team Commander to remove another member. The Team
    Commander and Chief of Police shall determine the
    validity of the grievance and the appropriate
    action, if any.

## F. TRAINING PROGRAM:

The Department recognizes the need to provide officers
assigned to the Team with training commensurate with their
duties.

Page 4 of Pages

| BRISTOL POLICE DEPARTMENT | GENERAL ORDER: | 95-1-134 |
|---|---|---|
| SUBJECT: EMERGENCY RESPONSE TEAM | EFFECTIVE DATE: AUG. 16, 1995 | |

A.   Team members will receive formal training in high
     risk operations,

B.   Team members will receive a minimum of four hours of
     departmental training each month.


Bureau/Division/Shift/Squad Commanders shall ensure that members of
their command are thoroughly familiar with, and understand, the
contents of this order.   —


BY ORDER OF: _____

        CHIEF WILLIAM R. KOHNKE


SUBJECT TO APPROVAL BY BOARD OF POLICE COMMISSIONERS    8/15/95


Reference Sources:
        North Central Municipal Regional Emergency Services
        Team (Bloomfield, Avon, Canton, Granby, Simsbury,
            Windsor Police Depts.),
        Newington Police Dept.,
        Clearwater, Florida, Police Dept.,
        West Hartford Police Dept.,
        Danbury Police Dept.